**Edward T. GIBBS and Arlene E. Larson a/k/a Georgia Larson, Appellants (Defendants Below)**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 2–580A125.

Court of Appeals of Indiana, Second District.

Oct. 13, 1981.

---

John S. Brumfield, Muncie, for appellant Edward T. Gibbs.

Jack Quirk, Muncie, for appellant Arlene E. Larson.

Linley E. Pearson, Atty. Gen., Thomas D. Quigley, Deputy Atty. Gen., Indianapolis, for appellee.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Edward T. Gibbs (Gibbs) and Arlene E. Larson (Larson) were tried by a jury and found guilty of involuntary manslaughter and voluntary manslaughter respectively. They appeal on various grounds, including the sufficiency of the evidence, the denial of their motions for separate trials, and the admission of certain testimony and evidence, including photographs of the decedent and a videotape of the scene of the crime.

We affirm.

## FACTS

The decedent, James F. Buffin (Buffin), was known to have carried at least seven thousand dollars in fifty and one hundred dollar bills during the night of May 19, 1979. The small hours of the following morning, May 20, found him in Gene's Tavern in Muncie. He had been drinking heavily; a subsequent analysis of his blood showed the alcohol content to be in excess of 300 milligrams per deciliter.[1]

Arlene Larson, a waitress at Gene's Tavern, took Buffin to the home of her daugh-

---

1. Doctor Roger Fossum, the forensic pathologist who performed the autopsy on Buffin, testified that unconsciousness could result from a blood alcohol content of as little as 200 mg/dl, and that blood contents above the range of 400 to 500 mg/dl could be lethal.

ter, Justina Grueschow (Grueschow), 321 West Weber, Muncie, Indiana. The following persons were staying at the Grueschow home at that time: Grueschow; her mother, Larson; Larson's minor children, Brent and Gina; Larson's brother, Edward Gibbs (Gibbs); and a friend of Gibbs's, Richard Gurnard (Gurnard), who had escaped from a federal halfway house in Seattle, Washington. On the night of May 19–20, Gina Larson was staying with a friend for the night, and Bryan Jarvis, the child of a neighbor, was spending the night at the Grueschow home.

Gibbs and Larson admit that in the early morning of May 20, Buffin and Gibbs got into a violent fist fight in the living room of the Grueschow home during the course of which Larson took a serrated kitchen knife and drove it once into Buffin's shoulder, and again into his back, severing the left renal artery and vein, and causing Buffin to bleed to death. In delivering these blows, Larson's hand slipped on the knife and was cut deeply.

Bryan Jarvis was promptly sent home, and Gina Larson retrieved. Hastily, the entire group fled west, stopping in Iowa to purchase a fresh car for $1,850.00 in cash, paid in bills from which Gina Larson had washed blood.

When Buffin was found on the floor of the living room, it was apparent from the pattern of blood stains that he had lain face down for a time, and then had been laid on his back by bending him at the knees. His pockets contained $1.25 in change. The thousands of dollars he had flashed around the previous evening, and the small leather pouch he kept them in, had been taken.

Larson, Gibbs, and their kin left Iowa and crossed the Canadian border, finally to stay in Winnipeg, Manitoba. Early in the morning of June 5, Gibbs and Gurnard re-entered the United States at Pembina, North Dakota, where they identified themselves, were found to be wanted by the Muncie Police Department, and were arrested. On June 16, Larson and Grueschow returned to the United States by bus, identified themselves, and were arrested by U.S. Customs agents at Blaine, Washington.

Gibbs, Larson, and Grueschow were tried for murder. Grueschow was acquitted; Gibbs was found guilty of involuntary manslaughter, and Larson was found guilty of voluntary manslaughter.

Included in evidence presented to the jury were four color photographs showing Buffin's body as it was found at the scene of the crime, a thirty-five minute videotape of the scene of the crime, including Buffin's body, and twenty-six color slides depicting salient points in the autopsy of Buffin.

Additionally, the customs officers who first detained the defendants in Washington and North Dakota testified as to how they came to detain Gibbs, Larson, Grueschow, and Gurnard, including the inquiries they made to the National Crime Information Center (NCIC) computer, and the responses obtained from NCIC. Howard Lamphere, another son of Larson, who resides in Seattle, Washington, recounted two telephone conversations he had with Larson and Grueschow toward the end of May, in which Larson told him that they had been involved in a stabbing in Muncie. The children, Brent and Gina Larson and Bryan Jarvis, all testified as witnesses for the State. All three defendants testified in their own behalf.

Before trial, all defendants moved for individual trials. These motions were renewed at each stage of the proceedings, and were uniformly denied.

## ISSUES

The issues presented by the two defendants are identical. Recast and ordered for more convenient resolution, they are:

1. Was the evidence sufficient to overcome the defendants' motions for directed verdicts and to sustain the verdict?

2. Did the trial court err in admitting the videotape, photographs, and slides, all depicting Buffin's body at the house and during the autopsy?

3. Did the court err in refusing the defendants' claim of privilege against

the testimony of the children, Brent and Gina Larson and Bryan Jarvis?

4. Was the testimony of Howard Lamphere impermissible hearsay, did the court err in permitting the prosecutor to impeach Lamphere out of the hearing of the jury, and did the trial court mishandle certain defense motions made in relation to Lamphere's testimony?

5. Did the trial court err in permitting customs officer Howe of Pembina, North Dakota to testify as to the information he had obtained from NCIC, and his reaction to that information?

6. Did the trial court err in excluding defendant's exhibit one, Buffin's wallet?

7. Did the trial court err in refusing the defendants' motions for separate trial?

## I.

*ISSUE ONE*—Was the evidence sufficient to overcome the defendants' motions for directed verdicts and to sustain the verdict?

*PARTIES' CONTENTIONS*—The defendants made various motions for dismissal and for judgment on the evidence at various times during the trial, and on appeal they urge error in the denial of those motions; they also assert that the evidence was insufficient to sustain the judgment. These assertions amount to a single issue, since all turn on whether the record discloses evidence of probative value from which the jury could reasonably have inferred that the defendants were guilty. *Smith v. State,* (1970) 254 Ind. 401, 260 N.E.2d 558.

For his own part, Gibbs contends that the evidence shows only that he was engaged in a fist fight with Buffin, which was not lethal behavior. He argues that his sister bears sole responsibility for Buffin's death. He acknowledges that after Buffin was killed, he fled the country along with the rest of his family; but he urges that guilty knowledge is not the only inference to be drawn from such behavior.

*CONCLUSION*—Both convictions were supported by sufficient evidence.

■ The record unmistakably supports the jury's finding that Arlene Larson was guilty of voluntary manslaughter. We are not permitted to re-weigh the evidence, or to discount any evidence favorable to the verdict. *James v. State,* (1976) 265 Ind. 384, 354 N.E.2d 236. The evidence shows that while her brother and a stranger were fighting in her home, Larson became distraught, obtained a knife from the kitchen, and drove the knife into the back of James Buffin with sufficient force and effectiveness to indicate an intent to kill. Such a knowing or intentional homicide while under sudden heat constitutes voluntary manslaughter. I.C. 35–42–1–3.

■ Gibbs was convicted of involuntary manslaughter, which is defined thus: "A person who kills another human being while committing or attempting to commit . . . battery . . . commits involuntary manslaughter, a class C felony." I.C. 35–42–1–4. In essence, Gibbs argues that he cannot be convicted of killing another human being merely because Buffin died while Gibbs was battering him. Gibbs says further that he cannot be convicted as a principal in the death of James Buffin as the evidence at trial points inexorably to the conclusion that Buffin died of a stab wound to the back, and that Arlene Larson alone delivered the fatal blow. Homicide is an element of involuntary manslaughter, and in order to prove homicide, the State must show that the defendant caused an injury to the decedent contributing mediately or immediately to the decedent's death. *Reed v. State,* (1979) Ind.App., 387 N.E.2d 82, 84, and cases cited therein.

■ It remains, then, for us to determine whether the evidence supports the conclusion that Gibbs aided Larson in killing Buffin. "A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense . . . ." IC 35–41–2–4. To be sure, Gibbs was charged with murder, IC 35–42–1–1, and not with aiding. The previous statute,

IC 35–1–29–1, provided that an aider might "be tried and convicted in the same manner as if he were a principal," which meant that one who was charged as a principal could be convicted as an accessory. *E. g. Abrams v. State,* (1980) Ind., 403 N.E.2d 345.. We have found no discussion of this point under current law, but note that IC 35–41–2–4 provides that one who aids in the commission of an offense commits the offense itself; "aiding" is not a separate offense, but is merely one method of committing an offense. Therefore, a charge of murder, for instance, can still be proved by showing that the defendant aided another in committing murder.

The accessory statute requires that, to be guilty as an accessory, one must:

1. a) knowingly or b) intentionally
2. a) aid or b) induce or c) cause
3. another to commit an offense.

Assuming Gibbs's conviction for involuntary manslaughter was founded on his being an accessory, it follows that the jury found that he had knowingly or intentionally aided or caused Larson to kill Buffin while she was committing battery (i. e. to commit involuntary manslaughter). IC 35–41–2–4. While the accessory statute makes the commission of a crime by the principal an element to be proved against the accessory, it does not require that the principal be charged or convicted of that offense. Thus, to prove Gibbs was an accessory to involuntary manslaughter, the State must prove that Larson, the principal, committed involuntary manslaughter, *regardless of what she might be convicted of in her own right.*

The question before us then becomes: Was there evidence of probative value to permit the jury to infer that Edward Gibbs had aided Arlene Larson in committing involuntary manslaughter?

It has already been shown that Larson killed Buffin by stabbing him with a knife; this makes out a homicide committed in the course of battery, which is involuntary manslaughter. IC 35–42–1–4.

All accounts of the early morning of May 20, 1979 are agreed that Buffin and Gibbs engaged in a violent fist fight. Gibbs himself alleged that the fight resulted from Buffin's making improper advances on Justina Grueschow. So, accepting his version of events, Larson was presented with her brother engaged in violent combat with a man whose conduct was inimical to her family interests. It would not be unreasonable for a jury to infer that in the course of the fight, Gibbs solicited the help of his family in defeating Buffin. This would constitute inducing or causing others to commit battery upon Buffin, and Gibbs's continued fighting with Buffin would be an aid to that battery.

The jury could reasonably have inferred that Arlene Larson went to the aid of her brother at his behest, battered Buffin with a knife, and in the course of that battery, killed him. This is sufficient to justify a jury in convicting Gibbs as an accessory to involuntary manslaughter.

We reach this conclusion even though Larson was convicted of *voluntary* manslaughter. IC 35–41–2–4(2) provides that an accessory may be convicted of an offense "even if the other person . . . has not been convicted of the offense . . . ."

## II.

*ISSUE TWO*—Did the trial court err in admitting the videotape, photographs, and slides, all depicting Buffin's body at the house and during the autopsy?

*PARTIES' CONTENTIONS*—The defendants argue that the presentation of so many views, in so many different media, of Buffin's body could have served only to inflame the jury to a degree far outweighing the power of these exhibits to inform them.

*CONCLUSION*—The depictions of Buffin's body were admissible.

██ Photographic evidence, however gruesome, is admissible if it serves to inform the jury on matters relevant to the case. *E. g. Patterson v. State,* (1975) 263 Ind. 55, 324 N.E.2d 482. The trial court abuses its discretion in admitting such pho-

tographs only if the photographs are entirely irrelevant or immaterial to any issue in the prosecution. *Kiefer v. State*, (1958) 239 Ind. 103, 153 N.E.2d 899.

██ The photographs and videotape in this case each contribute to the proof of relevant facts. The four photographs show Buffin as he was found, before investigating officers had disturbed the scene. The videotape made clear the layout of the house and Buffin's position in it, as well as affording the jury an opportunity to see how the body and other evidence were handled at the scene. The autopsy photographs demonstrate that the body depicted is the same as the one found at 321 West Weber, depict the wounds both as found and when cleansed of blood, and single succinct views of Buffin's internal injuries.

All of these were illuminative of the prosecution's case, and were admissible.

### III.

*ISSUE THREE*—Did the court err in refusing the defendants' claim of privilege against the testimony of the children, Brent and Gina Larson and Bryan Jarvis?

*PARTIES' CONTENTIONS*—The defendants offered a motion to suppress the testimony of the children, Brent and Gina Larson, in this case on the grounds that a privilege ought to exist between parent and child in the interest of strengthening the family unit. The trial court overruled this motion.

*CONCLUSION*—There was no reason for the trial court to grant such a motion.

██ The defendants cite us to no authority, binding or persuasive, ancient or modern, in common or civil law, to support such a privilege. Because we may hear no argument unsupported by authority, Ind.Rules of Procedure, Appellate Rule 8.3(A)(7), and because the creation of new privileges are disfavored, *Ernst & Ernst v. Underwriters National Assurance Company*, (1978) Ind. App., 381 N.E.2d 897, we deem this issue waived.

### IV.

*ISSUE FOUR*—Was the testimony of Howard Lamphere impermissible hearsay; did the court err in permitting the prosecutor to impeach Lamphere out of the hearing of the jury; and did the trial court mishandle certain defense motions made in relation to Lamphere's testimony?

*CONCLUSION*—No error arises from Lamphere's testimony.

Gibbs offered a number of objections at trial to the testimony of Howard Lamphere (the son of Larson residing in Seattle, Washington), claiming that Lamphere's account of his conversation with Larson would be hearsay as to Gibbs. However, it developed that Lamphere's testimony made no reference to Gibbs at all. It tended neither to incriminate nor to exonerate him; consequently any error would be harmless as to Gibbs. We may not set aside judgments in criminal cases for errors which do no prejudice to the substantial rights of the defendant. I.C. 35–1–47–9.

During Lamphere's testimony, Gibbs's counsel moved that the jury be admonished to disregard Lamphere's testimony as it related to Gibbs, or in the alternative for a mistrial for Gibbs. He now asserts error in the denial of these motions, and in the trial court's interrupting counsel while making these motions. But these errors are all predicated on the danger that Lamphere's testimony posed to Gibbs's case. As we have already decided that no such danger existed, no error could result from the trial court's failure to avert such a danger. I.C. 35–1–47–9.[2]

██ The defendants claim that it was error for the trial court to permit the prosecution to ask Lamphere impeaching questions. These questions directed Lamphere's attention to statements he had made before trial which incriminated Larson. These questions were asked out of the presence of

2. It is important to note that Gibbs does not contend that the trial court behaved in such a way as to discredit his counsel in the eyes of the jury, thereby rendering him without effective assistance of counsel.

the jury, and induced no change in Lamphere's testimony. Once again, harmless error. *Id.*

■ As we have said, Lamphere's testimony was that Larson had told him that she and Grueschow were in Canada, having been involved in a stabbing in Muncie. We are inclined to believe that Larson's statements were in the nature of admissions, and thus not hearsay at all. Assuming the statements were hearsay, Larson's objection must fail for two reasons. First, Larson herself was in court, chose to testify, and therefore was subject to examination regarding the statements Lamphere said she made. These circumstances cure any error in admitting hearsay. *Flewallen v. State,* (1977) 267 Ind. 90, 368 N.E.2d 239; *Raymer v. State,* (1978) Ind.App., 381 N.E.2d 109. Second, Lamphere's testimony goes no farther than Larson herself went while on the witness stand. If hearsay is admitted, but adds nothing of substance to the facts before the jury, no error arises. *Pollard v. State,* (1979) Ind., 388 N.E.2d 496.

### V.

*ISSUE FIVE*—Did the trial court err in permitting customs officer Howe of Pembina, North Dakota to testify as to the information he had obtained from NCIC, and his reaction to that information?

*PARTIES' CONTENTIONS*—Gibbs posits error in the testimony of Maurice Howe, the United States customs officer who detained Gibbs and Gurnard, on two issues.

First, Howe testified over Gibbs' objection that the National Crime Information Center (NCIC) informed Howe that Gibbs was wanted by the Muncie Police Department for "willful kill with knife." Gibbs's theory is that because the NCIC printout is a writing, the best evidence rule would require that the printout itself be produced. He also contends that the report is hearsay.

*CONCLUSION*—Howe's testimony presents no reversible error.

■ Once again, we are in the realm of harmless error. Howe's testimony indicates nothing more than that a warrant had been issued for Gibbs in connection with the slaying of Buffin. In his own testimony, Gibbs acknowledged that he believed that he was wanted by the police, thus making Howe's testimony about the NCIC information merely repetitive. *See Pollard, supra.* In any event, the existence of a warrant against Gibbs was not an issue at trial; having been instructed that being charged with crime is no evidence of guilt, the jury could not have used the information about the warrant to Gibbs's prejudice. Consequently the introduction of the NCIC information was not reversible error. I.C. 35–1–47–9; *Isaac v. State,* (1971) 257 Ind. 319, 274 N.E.2d 231.

■ As to Howe's testimony that being alone and unarmed with Gibbs in the middle of the night frightened him, we note that no objection was made to this facet of his testimony. The only objections the defendants made at that time related to Howe's competency to testify as to the NCIC information. Insofar as the defendants suggest that the testimony prejudices them by insinuating that Gibbs is a dangerous character, that suggestion is made for the first time on appeal. Defendants are not permitted to introduce new grounds for objecting to the admissibility of evidence on appeal. *Beasley v. State,* (1977) 267 Ind. 396, 370 N.E.2d 360.

### VI.

*ISSUE SIX*—Did the trial court err in excluding defendant's exhibit one, Buffin's wallet?

*PARTIES' CONTENTIONS*—During their case-in-chief, the defendants offered into evidence the wallet of James Buffin, with the idea of demonstrating that seven thousand dollars in cash could not possibly fit in the wallet. They now posit error in the refusal of the trial court to admit the wallet into evidence.

*CONCLUSION*—The wallet was properly excluded.

■ The billfold was excluded because it was not relevant to any issue in the case. Evidence is relevant when it possesses some

tendency, however slight, to increase or decrease the probability that a fact at issue in the case is true. *Musick v. State*, (1976) 265 Ind. 207, 352 N.E.2d 717.

The introduction of the wallet could not have tended to prove or disprove any material fact in this case. No witness at trial ever contended that Buffin carried a large sum of money in his wallet; the testimony shows that the money was carried in a leather pouch attached by a chain to his belt. The fact that Buffin's wallet could not accommodate seven thousand dollars merely shows that Buffin did not carry seven thousand dollars *in his wallet*, but may have carried it by other means. The issue of where Buffin carried his money has nothing to do with whether the defendants killed him.

### VII.

*ISSUE SEVEN*—Did the trial court err in refusing the defendants' motions for separate trial?

 At various stages in the proceedings, the defendants made and renewed motions for separate trials. These motions were made pursuant to I.C. 35–3.1–1–11(b) which provides that the court shall require the prosecution to elect either separate trials for the defendants or a joint trial at which certain evidence is modified or suppressed, in the following circumstance:

"Whenever two or more defendants have been joined for trial in the same indictment or information and one or more of the defendants move for a separate trial because another defendant has made an out-of-court statement which makes reference to the moving defendant but is not admissible as evidence against him . . . ."

The reason the defendants' motion under I.C. 35–3.1–1–11(b) was denied is evident: Not a single out-of-court statement made by any of the three defendants at trial referring to any of the others was offered during the trial. The defendants point to the testimony of Howard Lamphere as containing statements by Larson that refer to Gibbs. An inspection of the record shows that this is not so.

As the defendants have not shown us how it was error to deny their motions for separate trials, we cannot reverse.

### VIII.

Reluctantly, we must address another aspect of this case. In the course of arguing the sufficiency of the evidence against Larson, her counsel included the following sentence on page 45 of the brief he prepared, purportedly on her behalf:

At this point in time, Arlene Larson, convicted of voluntary manslaughter, stabbed the decedent, James Franklin Buffin, in the back, severing his renal artery and almost cutting her fingers off in the process and this severing of the renal artery is what the pathologist testified to as the direct and proximate cause of the death of the decedent, James Franklin Buffin.

Seventy-six of the ninety-three pages of Larson's brief are photocopied from Gibbs's brief; most of the remainder were retyped, with amendments, from Gibbs's brief. Jack Quirk, Larson's attorney, did not see fit to even perfunctorily challenge this vigorous assertion of his client's guilt.

This breach of advocacy was personally called to Mr. Quirk's attention, and an opportunity offered him to rebrief for his client. Mr. Quirk has declined. We recognize that public defenders have heavy demands upon their time, and must frequently prosecute criminal appeals which have little or no merit. We also are aware that issues raised by co-defendants at a joint trial will often be similar, and that a joint brief in such cases may be the best course for both defendants.

There is, however, a significant difference between adopting the work of a colleague when co-defendants have similar interests, and adopting statements against a client's interest—for whatever reason. Mr. Quirk's brief, presumably on behalf of Larson, reproduces not only Gibbs's attacks on Larson's position, but also, uncritically, Gibbs's research and argument on matters vital to Larson's case. That Mr. Quirk has

passed on, unaltered, arguments that apply only to Gibbs, and made no effort to correct citation errors in the Gibbs brief, vitiates his claim that he adopted the Gibbs brief after a careful inspection of the arguments. His brief was not filed until more than eight weeks after the Gibbs brief was filed, for which he received a fee of $1500. As Justice Arterburn observed in *Frith v. State* (1975), 263 Ind. 100, 325 N.E.2d 186, 189: "A brief is not to be a document thrown together without either organized thought or intelligent editing on the part of the brief-writer."

As Canon Six of the Code of Professional Responsibility requires that a lawyer should represent a client competently, this matter is referred to the Supreme Court Disciplinary Commission for investigation.

The convictions are affirmed.

SHIELDS, J., concurs.

SULLIVAN, J., concurs and files separate opinion.

SULLIVAN, Judge, concurring.

I concur. I would go further, however, than does the majority opinion in part VIII. I would order Mr. Quirk to repay the County within 30 days the $1,500 fee collected by him for this appeal together with interest thereon at the rate of 8% from the date he collected the fee. If he should fail to do so, I would order him to show cause why he should not be held in contempt.

Although the matter of establishing fees for appellate representation falls within the purview of the trial court, the standard procedure throughout the state of Indiana does not afford the trial court an opportunity to review the quality of that appellate representation. Following the trial court's ruling on a Motion to Correct Errors, that court is divested of jurisdiction. The briefs of the parties are not served upon the trial judge. The allowance of and payment of fees is therefore routine. In most instances the trial court does and should be able to rely upon counsel's integrity and professional responsibility to expeditiously and competently represent the client and to request only such fee as constitutes adequate compensation for the work done. Until such time as the procedures are changed, it is within the prerogative of this court, I believe, to make an order for repayment of a fee.