

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-9-1997

# In Re: Grand Jury

Precedential or Non-Precedential:

Docket 95-7354,96-7529,96-7530

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation
"In Re: Grand Jury" (1997). *1997 Decisions.* Paper 7.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/7

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

----------

No. 95-7354

----------

IN RE:  GRAND JURY

----------

On Appeal from the District Court
of the Virgin Islands
(St. Croix)
(D.C. Civil No. 95-00009)

----------

Argued Tuesday, April 16, 1996
at St. Thomas, Virgin Islands

BEFORE:  MANSMANN, SAROKIN[*]
and GARTH, Circuit Judges

Reargued Monday, October 7, 1996
at Philadelphia, Pennsylvania

BEFORE:  MANSMANN, GREENBERG
and GARTH, Circuit Judges


Gordon C. Rhea (Argued)
Alkon, Rhea & Hart
2115 Queen Street
Christiansted, St. Croix
USVI,  00820

Attorneys for Appellant
in Appeal No. 95-7354

James A. Hurd, Jr.
Azekah E. Jennings
Office of United States Attorney
1108 King Street, Suite 201
Christiansted, St. Croix
U.S. Virgin Islands  00820

---

*Judge Sarokin retired from office prior to the filing of our opinion.

1

David S. Kris (Argued)
United States Department of Justice
Criminal Division
P.O. Box 899
Ben Franklin Station
Washington, D.C.  20044-0899

Attorneys for Appellee
in Appeal No. 95-7354


----------

Nos. 96-7529/7530

----------

IMPOUNDED

----------

On Appeal from the United States District Court
for the District of the Delaware
(D.C. Civil No. 96-51)

----------

Argued Monday, October 7, 1996
at Philadelphia, Pennsylvania

BEFORE:  MANSMANN, GREENBERG
and GARTH, Circuit Judges


Charles M. Oberly, III
Kathleen M. Jennings
Oberly, Jennings & Drexler
800 Delaware Avenue
P.O. Box 2054
Wilmington, Delaware  19899

Bartholomew J. Dalton (Argued)
Brandt & Dalton
3 Mill Road
P.O. Box 2307
Wilmington, Delaware  19899

Attorneys for Appellant
John Doe 1 in Appeal No. 96-7529

George H. Seitz, III (Argued)
Pricket, Jones, Elliott, Kristol
    & Schnee
1310 King Street
P.O. Box 1328
Wilmington, Delaware 19899

Attorneys for Appellant
John Doe 2, as Parent and
the Minor Child,

Guardian of

Child,

and the Minor Child
in Appeal No. 96-7529

Gregory M. Sleet
United States Attorney
Colm F. Connolly (Argued)
Assistant U.S. Attorney
Chemical Bank Plaza
1201 Market Street, Suite 1100
P.O. Box 2046
Wilmington, Delaware 19899-2046

Attorneys for Appellee
in Appeal Nos. 96-7529/7530

----------

(Opinion filed January 9, 1997)

----------

OPINION OF THE COURT

----------

GARTH, Circuit Judge:

Three appeals presenting the same critical issue are before us. One appeal originated in the District Court of the Virgin Islands at docket number 95-7354. The other two appeals pertaining to the same Delaware defendant originated in the

District Court of Delaware at docket numbers 96-7529 and 96-7530.[1]

We scheduled oral argument in all three appeals on the same day inasmuch as they raised the same question – should this court recognize a parent-child privilege? The Delaware appeals also challenge the adequacy of a Schofield affidavit and charge that the in camera ex parte proceeding permitted by the district court constituted a deprivation of due process. We answer the questions presented by holding that a parent-child privilege should not be recognized, and we affirm the district court's rulings which rejected the appellants' objections to the Schofield affidavit and in camera ex parte proceeding.

**I.**

The facts and procedure of the Virgin Islands case giving rise to one appeal, and of the Delaware case giving rise to two appeals, will be stated separately.[2]

---

1. Throughout this opinion, where separate identification of the appeals is appropriate, we will refer to the appeal which came from the District Court of the Virgin Islands as the "Virgin Islands appeal" and the appeals from the District of Delaware as the "Delaware appeals".

2. Due to the nature of the proceedings, the district courts in both matters impounded the entire record in each case to protect the privacy interests of the parties. Consequently, we do not identify by name either the father or the son who is the target of the grand jury investigation in the Virgin Islands case; nor the daughter or the father who is the target of the grand jury investigation in the Delaware case.

Docket Number 95-7354: In the Virgin Islands case, the grand jury sitting in St. Croix subpoenaed the father of the target of the grand jury investigation as a witness.[3] The target of the grand jury proceeding was the son of the subpoenaed witness. The son became the target of a government investigation as a result of "certain transactions that [he] was allegedly involved in." Tr. at 11. At the time of the alleged transactions, the son was eighteen years old.

The grand jury subpoenaed the target's father to testify on April 18, 1995. The father, a former FBI agent, lived with his wife and son in St. Croix. On April 17, 1995, based on his belief that the grand jury intended to question him about conversations that he had had with his son, the father moved to quash the subpoena, asserting that those conversations were privileged from disclosure under Fed. R. Evid. 501.

The father testified, at a hearing before the district court, that he and his son "ha[d] an excellent relationship, very close, very loving relationship." Tr. at 4. He further testified that if he were coerced into testifying against his son, "[their] relationship would dramatically change and the closeness that [they] have would end . . . ." Id. at 5. The

---

3. The term of the grand jury in the Virgin Islands case was to have ended on September 17, 1996. However, by Order of the District Court of the Virgin Islands entered on September 3, 1996, the term was extended until March 17, 1997.

father further explained that the subpoena would impact

negatively upon his relationship with his son:

> I will be living under a cloud in which if my son comes to me or talks to me, I've got to be very careful what he says, what I allow him to say. I would have to stop him and say, "you can't talk to me about that. You've got to talk to your attorney." It's no way for anybody to live in this country.

Id. at 6.

On June 19, 1995, the district court entered its order denying the father's motion to quash. On the same day, the district court granted the targeted son's motion to intervene and then stayed its order which denied the quashing of the father's subpoena pending any appeal. The court's memorandum opinion and order, although clearly sympathetic with the plight of the subpoenaed father, "regretfully decline[d] to recognize [a parent-child] privilege" because the Third Circuit had yet to address the issue and "every United States Court of Appeals that has confronted this question has declined to recognize the parent-child privilege." In re Grand Jury Proceeding, Misc. No. 95-0009, at 14 (D.V.I. June 19, 1995). Appeal of the June 19, 1995 order was promptly taken by the targeted son on June 22, 1995.[4]

---

4. The original appeal in the Virgin Islands case was heard in St. Thomas by a panel of this court of which Judge Sarokin was a member. Prior to the filing of an opinion, Judge Sarokin retired from office and Judge Greenberg replaced him on the panel. Panel rehearing was ordered.

Docket Numbers 96-7529 & 96-7530: In the Delaware case, a sixteen year old minor daughter was subpoenaed to testify before the grand jury, as part of an investigation into her father's participation in an alleged interstate kidnapping of a woman who had disappeared. The daughter was scheduled to testify on September 10, 1996. However, on September 9, 1996, a motion to quash subpoena was made by counsel for the daughter and her mother, as well as by separate counsel for the father.[5]

The motion sought to bar the testimony of the daughter claiming a parent-child privilege which would cover testimony and confidential communications. "[T]he privilege [was] claimed for confidential communications as well as for protection against being compelled to testify in a criminal proceeding". Joint Motion to Quash Subpoena at ¶ 5.

The district court held a hearing during the morning of September 10, 1996; ordered further briefing due that afternoon[6]; and issued a ruling in the late afternoon denying the motion to

5. It appears that although the mother and father of the minor witness have taken similar positions in this litigation, albeit by different counsel, at the time of these proceedings, they were separated.

6. The additional briefing was on the issue of whether the daughter's testimony would be material and non-duplicative. During the hearing, the district court placed the burden on the government to make a substantial showing that this threshold was met. The government filed a Schofield affidavit, see infra, and volunteered to furnish further particulars at an in camera ex parte hearing. The parents and daughter opposed the in camera ex parte proceeding, arguing that if they were foreclosed from listening to the government's proffer, there would be no basis upon which they could rebut the evidence presented.

quash and ordering the minor daughter to testify before the grand jury that evening.

In the order, the district court reasoned that, because there is "no recognized familial privilege", the appropriate process for determining whether to grant the motion to quash was "to weigh the competing interests of the parties in order to determine whether the anticipated testimony of the minor child is material and nonduplicative, thus tipping the scales toward requiring the testimony". In re Grand Jury, 96-cv-51, at 1 (D. Del. September 10, 1996). The district court concluded that, based on the government's in camera ex parte proffer, "the government's interests in compelling the testimony outweigh the privacy interests asserted by the moving parties" and denied the motion to quash on those grounds. See id. at 2.

Pursuant to the court order, the daughter appeared at court (in an ante-room to the grand jury courtroom) in the evening of September 10, 1995. She refused to testify and was found in contempt. The district court then stayed the imposition of sanctions during the pendency of these appeals. Appeal of the September 10, 1996 order was promptly made in joint motions by mother and daughter, and father on September 13, 1996.[7]

---

7. The appeals in the Delaware case were expedited by this court so that the common issue of parent-child privilege could be heard and resolved in the Delaware and Virgin Island cases at the same time.

The district courts had jurisdiction over both the Virgin Islands case and Delaware case under 18 U.S.C. § 3231. We have appellate jurisdiction over the appeals taken by the intervenors pursuant to 28 U.S.C. § 1291. See Perlman v. United States, 247 U.S. 7, 12-13 (1918); In re Grand Jury Proceedings (C. Schmidt & Sons, Inc.), 619 F.2d 1022, 1024 (3d Cir. 1980). In addition, in the Delaware case, the daughter appealed on her own behalf after being cited for contempt, providing separate grounds for jurisdiction. See Cobbledick v. United States, 309 U.S. 323 (1940); Alexander v. United States, 201 U.S. 117 (1906); In re Grand Jury Proceedings, 619 F.2d at 1024.

Our review as to all issues, is plenary.

## II.

Because we find little merit in the arguments advanced in the Delaware case pertaining to the Schofield affidavit and the in camera proceeding before the district court, we will dispose of these two issues first and without substantial discussion. We then will turn to the more pressing issue of whether we should be the first federal Court of Appeals to recognize a parent-child privilege.

We have held that, when a subpoena for purposes of a grand jury proceeding is challenged, the government is "required to make some preliminary showing by affidavit that each item is at least relevant to an investigation being conducted by the

9

grand jury and properly within its jurisdiction, and is not sought primarily for another purpose."  In re Grand Jury Proceedings, 486 F.2d 85, 93 (3d Cir. 1973) (Schofield I); see also In re Grand Jury Proceedings, 507 F.2d 963, 966 (3d Cir.) (Schofield II) (identifying this burden of proof as a "three-pronged showing requirement"), cert. denied sub nom. Schofield v. United States, 421 U.S. 1015 (1975).  This requirement stems from the Schofield cases (I and II) where the targeted defendant had refused to furnish handwriting exemplars and had refused to allow her fingerprints and photograph to be taken.  We have commonly referred to such an affidavit as a Schofield affidavit.[8]

Appellants in the Delaware case argue that the government's Schofield affidavit[9] was insufficient since it was "simply a mere recitation of the requirements, rather than a substantive document and was not sufficient to enable the District Court to properly balance the interests of the parties."  Brief of Appellant Doe #1 at 21.  They argue further that "The Government's affidavit does not meet. . . [the Schofield II] test. . . It is written in conclusory terms and makes no effort

8.  In Schofield II, we held that the affidavit complying with this three-pronged requirement sufficed to meet the government's burden and hence we upheld the government's subpoena.  See Schofield II, 507 F.2d at 963.

9.  The affidavit stated that the daughter's testimony would be "essential and necessary" and "relevant" to the grand jury investigation; that the testimony was "properly within the Grand Jury's jurisdiction" and was "not sought primarily for any other purpose".  Government's Response to Joint Motion to Quash Subpoena at ¶ 4.

10

to state any facts at all. . . . More should be required where the Government seeks to place a child in a Grand Jury proceeding..." Brief of Appellant Doe #2 at 25.

Our review of the affidavit presented by the government in the present matter satisfies us that it contained the requisite elements as mandated in Schofield II. It "provide[s] a minimum disclosure of the grand jury's purpose" by demonstrating that the daughter's testimony would be "at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose". Schofield II, 507 F.2d at 965 (citing Schofield I, 486 F.2d at 93). These elements satisfy the minimal disclosure requirements of Schofield II.

The district court could, of course, in its discretion, require additional information. See Schofield II, 507 F.2d at 965. Here the district court exercised its discretion by not requiring anything additional in the affidavit, but decided instead to hold a hearing on the government's proffer and to do so in camera and ex parte.

We hold that the government met its burden of proof with regard to the adequacy of the Schofield affidavit, and since the appellants have not demonstrated that the affidavit was insufficient or that there was an abuse of the grand jury process, we are persuaded that the district court did not err in finding the Schofield affidavit proper. See Schofield I, 486

11

F.2d at 92 ("the party objecting to the enforcement has the burden of making some showing of irregularity"); Schofield II, 507 F.2d at 965 ("the burden is generally on the witness to show abuse of the grand jury process").

Appellants next argue that the district court erred in conducting the in camera hearing ex parte. They contend that they were prejudiced by their inability to respond to the government's proffer and that therefore their due process rights were violated.[10] We cannot agree.

District courts have considerable discretion in determining whether additional proceedings – beyond the Schofield affidavit – are warranted, including in camera hearings. See Schofield I, 486 F.2d at 93; see generally United States v. Zolin, 491 U.S. 554, 572 (1988).

The purpose of the in camera hearing was to aid the district court in balancing the government's need for the daughter's testimony against the privacy concerns of the daughter and her family. The district court placed a threshold burden on the government to demonstrate the materiality and non-duplicative nature of the daughter's testimony, in order that it could determine whether the testimony was necessary for the grand jury proceedings, or whether instead, it should grant appellants' motion to quash.

10. Appellants cite 18 U.S.C. § 3509(a)(2) (Supp. 1996) as support for their argument; however, we note that this provision, concerning child abuse, has no relevance to the present matter.

The government's proffer was presented in camera and heard ex parte in order to protect the confidentiality of the grand jury proceeding. Ex parte in camera hearings have been held proper in order to preserve the ongoing interest in grand jury secrecy. See generally In re Marc Rich & Co., 707 F.2d 663, 670 (2d Cir.), cert. denied, 463 U.S. 1215 (1983); In re Grand Jury Matter (Catania), 682 F.2d 61, 66 (3d Cir. 1982). The secrecy of the grand jury proceedings in the present matter might have been compromised by divulging the specific questions that the government intended to ask during the daughter's testimony. Judicial supervision and interference with grand jury proceedings should always be kept to a minimum. See, e.g., United States v. Williams, 504 U.S. 36, 50 (1992).

After reviewing the government's in camera proffer, the district court judge denied the motion to quash, having determined that the daughter's testimony would be material and non-duplicative, and that "the government's interests in compelling the testimony outweigh the privacy interests asserted by the moving party". In re Grand Jury, 96-cv-51, at ¶ 3 (D. Del. September 10, 1996). We hold that the district court did not abuse its discretion in hearing the government's proffer in camera and ex parte.[11]

11. In her dissenting and concurring opinion, Judge Mansmann registers disturbance because of the Schofield procedure employed by the district court. See Dissenting Opinion at 20-21.
    We are bound by Schofield. See I.O.P. § 9.1. The district court judge adhered to our Schofield instruction and properly exercised her discretion in holding an in camera ex

13

**III.**

The central question in these appeals is one of first impression in this court: should we recognize a parent-child testimonial privilege?  Appellants argue that recognition is necessary in order to advance important public policy interests such as the protection of strong and trusting parent-child relationships; the preservation of the family; safeguarding of privacy interests and protection from harmful government intrusion; and the promotion of healthy psychological development of children.  <u>See</u> Brief of Appellant in Virgin Islands case at 8-9; Brief of Appellant Doe #1 at 9-14; Brief of Appellant Doe #2 at 10-20.  These public policy arguments echo those advanced by academicians and other legal commentators in the myriad of law review articles discussing the parent-child testimonial privilege.[12]

(..continued)
<u>parte</u> hearing which we have found to be within the <u>Schofield</u> doctrine.  Judge Mansmann's criticism of that procedure is one that can only be remedied by an <u>en banc</u> court.

12.   <u>See, e.g.</u>, Yolanda L. Ayala & Thomas C. Martyn, <u>To Tell or Not to Tell?  An Analysis of Testimonial Privileges:  The Parent-Child and Reporter Privileges</u>, 9 St. John's J. Legal Comment. 163 (1993); Daniel R. Coburn, <u>Child-Parent Communications:  Spare the Privilege and Spoil the Child</u>, 74 Dick. L. Rev. 599 (1970); David A. Schlueter, <u>The Parent-Child Privilege:  A Response to Calls for Adoption</u>, 19 St. Mary's L.J. 35 (1987); Ann M. Stanton, <u>Child-Parent Privilege for Confidential Communications:  An Examination and Proposal</u>, 16 Fam. L.Q. 1 (1982); Larry M. Bauer, Note, <u>Recognition of a Parent-Child Testimonial Privilege</u>, 23 St. Louis U. L.J. 676 (1979); Jeffrey Begens, Comment, <u>Parent-Child Testimonial Privilege:  An Absolute Right or an Absolute Privilege?</u>, 11 U. Dayton L. Rev. 709 (1986); Betsy Booth, Comment, <u>Under-Privileged Communications:  The Rationale for a</u>

Although legal academicians appear to favor adoption of a parent-child testimonial privilege, no federal Court of Appeals and no state supreme court has recognized such a privilege. We too decline to recognize such a privilege for the following reasons:

    (1) The overwhelming majority of all courts--federal or state--have rejected such a privilege.

        (a) Eight federal Courts of Appeals have rejected such a privilege and none of the remaining Courts of Appeals have recognized such a privilege.

        (b) Every state supreme court that has addressed the issue has rejected the privilege, and only four states have protected parent-child communications in some manner.[13]

(..continued)
Parent-Child Privilege, 36 Sw. L.J. 1175 (1983); J. Tyson Covey, Note, Making Form Follow Function: Considerations in Creating and Applying a Statutory Parent-Child Privilege, 1990 U. Ill. L. Rev. 879; Gregory W. Franklin, Note, The Judicial Development of the Parent-Child Testimonial Privilege: Too Big For Its Britches?, 26 Wm. & Mary L. Rev. 145 (1984); Patrick Koepp, Comment, A Parent-Child Testimonial Privilege: Its Present Existence, Whether It Should Exist, and To What Extent, 13 Cap. U. L. Rev. 555 (1984); Bruce N. Lemons, Comment, From the Mouths of Babes: Does the Constitutional Right of Privacy Mandate a Parent-Child Privilege?, 1978 B.Y.U. L. Rev. 1002 (1978); Comment, The Child-Parent Privilege: A Proposal, 47 Fordham L. Rev. 771 (1979); Comment, Confidential Communication Between Parent and Child: A Constitutional Right, 16 San Diego L. Rev. 811 (1979); Note, Questioning the Recognition of a Parent-Child Testimonial Privilege, 45 Alb. L. Rev. 142 (1980); Note, Parent-Child Loyalty and Testimonial Privilege, 100 Harv. L. Rev. 910 (1987); Note, Parent-Child Testimonial Privilege: Preserving and Protecting the Fundamental Right to Family Privacy, 52 U. Cin. L. Rev. 901 (1983).

13. New York is the only state which has a judicially-recognized parent-child privilege; however, the privilege has only been recognized by inferior New York courts.

    Idaho and Minnesota are the only states which have recognized a variant of the parent-child privilege through statute. See Idaho Code § 9-203(7) (1990 & Supp. 1995); Minn. Stat. § 595.02(1)(j) (1988 & Supp. 1996). It is important to note that neither statute is rooted in the common law.

15

(c) No state within the Third Circuit has recognized a parent-child privilege.

(2) No reasoned analysis of Federal Rule of Evidence 501 or of the standards established by the Supreme Court or by this court supports the creation of a privilege.

(3) Creation of such a privilege would have no impact on the parental relationship and hence would neither benefit that relationship nor serve any social policy.

(4) Although we have the authority to recognize a new privilege, we believe the recognition of such a privilege, if one is to be recognized, should be left to Congress.

## A. FEDERAL AND STATE COURTS HAVE DECLINED TO RECOGNIZE A PARENT-CHILD PRIVILEGE.

### 1. Eight Federal Courts of Appeals Have Explicitly Rejected the Privilege and None of the Remaining Courts of Appeals Have Recognized the Privilege.

The appellants rely primarily upon law review articles rather than case law authority to support the position that a parent-child testimonial privilege should be recognized. No case law recognizing such a privilege exists. On the other hand, the eight federal Courts of Appeals that have addressed the issue have uniformly declined to recognize a parent-child privilege.

(..continued)
Massachusetts law prevents a minor child from testifying against a parent in a criminal proceeding. However, the statute does not go so far as to recognize a parent-child testimonial privilege. First, the Massachusetts statute does not create a testimonial privilege; rather it is best described as a witness-disqualification rule. Second, the testimonial bar is not of common-law origin but is statutory. Finally, the statute only bars a minor child, under certain circumstances, from testifying against a parent, and does not extend to children of all ages in all circumstances. See Mass. Gen. L. ch. 233, § 20 (1986 & Supp. 1996).

16

See In re Erato, 2 F.3d 11 (2d Cir. 1993); In re Grand Jury Proceedings (John Doe), 842 F.2d 244 (10th Cir.), cert. denied, 488 U.S. 894 (1988); United States v. Davies, 768 F.2d 893 (7th Cir.), cert. denied sub nom. Kaprelian v. United States, 474 U.S. 1008 (1985); Port v. Heard, 764 F.2d 423 (5th Cir. 1985); United States v. Ismail, 756 F.2d 1253 (6th Cir. 1985); In re Grand Jury Subpoena (Santarelli), 740 F.2d 816 (11th Cir.) (per curiam), reh'g denied, 749 F.2d 733 (11th Cir. 1984); United States v. Jones, 683 F.2d 817 (4th Cir. 1982); In re Grand Jury Proceedings (Starr), 647 F.2d 511 (5th Cir. Unit A May 1981) (per curiam); United States v. Penn, 647 F.2d 876 (9th Cir.) (en banc), cert. denied, 449 U.S. 903 (1980).  Moreover, the remaining federal Courts of Appeals that have not explicitly rejected the privilege have not chosen to recognize the privilege either.

Additional federal case law rejecting the privilege can be found in district court cases and in related contexts where the privilege was disapproved.  See United States v. Duran, 884 F. Supp. 537, 541 (D.D.C. 1995) ("The general rule in most federal courts is that there is no parent-child privilege."); In re Kinoy, 326 F. Supp. 400, 406 (S.D.N.Y. 1970) ("[T]here is no such thing [as a parent-child privilege].").  Cf. In Re Grand Jury Subpoena (Matthews), 714 F.2d 223, 224-25 (2d Cir. 1983) (holding that grand jury witness was not entitled to assert a "family privilege" to avoid answering questions that might incriminate his in-laws); United States v. (Under Seal), 714 F.2d

17

347, 349 n.4 (4th Cir.) (refusing to recognize privilege not to testify against brother and cousin), cert. dismissed sub nom. Doe v. United States, 464 U.S. 978 (1983); United States ex rel. Riley v. Franzen, 653 F.2d 1153, 1160 (7th Cir.) (declining to recognize parent–child privilege under Illinois law), cert. denied, 454 U.S. 1067 (1981).

2.<u>State Courts Have Overwhelmingly Rejected the Privilege.</u>

The overwhelming majority of state courts, like their federal counterparts, have also declined to recognize a common-law parent-child privilege.  <u>See, e.g.</u>, <u>In re Inquest Proceedings</u>, 676 A.2d 790 (Vt. 1996)[14]; <u>In re Terry W.</u>, 130 Cal. Rptr. 913 (Cal. Ct. App. 1976); <u>Marshall v. Anderson</u>, 459 So. 2d 384 (Fla. Dist. Ct. App. 1984); <u>People v. Sanders</u>, 457 N.E.2d 1241 (Ill. 1983);  <u>Gibbs v. State</u>, 426 N.E.2d 1150 (Ind. Ct. App. 1981); <u>Cissna v. State</u>, 352 N.E.2d 793 (Ind. Ct. App. 1976); <u>State v. Gilroy</u>, 313 N.W.2d 513 (Iowa 1981); <u>State v. Willoughby</u>, 532 A.2d 1020, 1022 (Me. 1987); <u>State v. Delong</u>, 456 A.2d 877 (Me. 1983); <u>Three Juveniles v. Commonwealth</u>, 455 N.E.2d 1203 (Mass. 1983), <u>cert. denied sub nom.</u> <u>Keefe v. Massachusetts</u>, 465 U.S. 1068 (1984); <u>State v. Amos</u>, 414 N.W.2d 147 (Mich. Ct. App. 1987) (per curiam); <u>Cabello v. State</u>, 471 So. 2d 332 (Miss. 1985), <u>cert. denied</u>, 476 U.S. 1164 (1986); <u>State v. Bruce</u>, 655 S.W.2d 66, 68 (Mo. Ct. App. 1983); <u>State ex rel. Juvenile Dept. of Lane County v. Gibson</u>, 718 P.2d 759 (Ore. Ct. App. 1986); <u>In re Gail D.</u>, 525 A.2d 337 (N.J. Super. Ct. App. Div. 1987); <u>In re Frances J.</u>, 456 A.2d 1174 (R.I. 1983); <u>De Leon v. State</u>, 684 S.W.2d 778 (Tex. Ct. App. 1984); <u>State v. Maxon</u>, 756 P.2d 1297 (Wash. 1988). <u>Cf.</u> <u>Stewart v. Superior Court</u>, 787 P.2d 126 (Ariz. 1989).[15]

14.  The appellants in <u>In re Inquest Proceedings</u>, 676 A.2d 790 (Vt. 1996) cited the cases of <u>In re Grand Jury Proceedings (Agosto)</u>, 553 F. Supp. 1298 (D. Nev. 1983) and <u>People v. Fitzgerald</u>, 422 N.Y.S.2d 309 (Westchester County Ct. 1979), in

3. <u>Only Two Federal District Court Cases Recognize the Privilege, and These Cases are Distinguishable and Not Authoritative.</u>

The parent-child privilege has not been recognized by

any federal or state court with the exception of two federal
(..continued)
support of their argument that a parent-child privilege should be recognized.  The Vermont Supreme Court declined to follow either case: it declined to follow <u>Agosto</u> for much the same reasons as we discuss <u>infra</u> in text, and it declined to follow <u>Fitzgerald</u> which was limited by <u>People v. Harrell</u>, 450 N.Y.S.2d 501 (N.Y. App. Div. 1982), <u>aff'd</u>, 463 N.Y.S.2d 185 (N.Y. 1983).  <u>See</u> <u>infra</u> note 15.

15.  New York's inferior courts are the only state courts which have judicially recognized a parent-child privilege.  <u>See</u> <u>In re Mark G.</u>, 410 N.Y.S.2d 464 (N.Y. App. Div. 1978); <u>In re A & M</u>, 403 N.Y.S.2d 375 (N.Y. App. Div. 1978); <u>In re Ryan</u>, 474 N.Y.S.2d 931 (N.Y.  Fam. Ct. 1984); <u>People v. Fitzgerald</u>, 422 N.Y.S.2d 309 (Westchester County Ct. 1979).  The privilege so-recognized is essentially derived from New York's constitution.  The New York Appellate Division explained that the privilege it recognized was rooted in the constitutional right to privacy:

Notwithstanding the absence of a statutory privilege, we may, nevertheless, draw from the principles of privileged communications in determining in what manner the protection of the <u>Constitution</u> should be extended to the child-parent communication. . . .  We conclude . . . that communications made by a minor child to his parents within the context of the family relationship may, under some circumstances, lie within the 'private realm of family life which the state cannot enter.'"

<u>In re A & M</u>, 403 N.Y.S.2d at 381 (quoting <u>Prince v. Massachusetts</u>, 321 U.S. 158, 166 (1944)) (emphasis added); <u>see also</u> <u>People v. Harrell</u>, 450 N.Y.S.2d 501, 504 (N.Y. App. Civ. 1982) (privilege is not rooted in common law, statute, or the 6th amendment).
New York courts apply the parent-child privilege sparingly.  For example, New York's Court of Appeals declined to apply the parent-child privilege to a murder confession made by a 28 year old defendant to his mother, due to defendant's age; lack of confidentiality; subject of conversation; and the fact that the mother had already testified in front of grand jury proceeding.  <u>See</u> <u>People v. Johnson</u>, 644 N.E.2d 1378, 1378 (N.Y. 1994).

20

district court cases which are readily distinguishable: In re Grand Jury Proceedings (Agosto), 553 F. Supp. 1298 (D. Nev. 1983) and In re Grand Jury Proceedings (Greenberg), 11 Fed. R. Serv. (Callaghan) 579 (D. Conn. 1982).

In Agosto, the thirty-two-year-old son of an alleged tax evader moved to quash a subpoena ad testificandum requiring him to testify against his father. See Agosto, 553 F. Supp. at 1299. Although the district court recognized a common-law privilege, it did so in derogation of the prevailing jurisprudence of the Ninth Circuit, which, in an en banc decision, had expressly rejected a parent-child privilege. See United States v. Penn, 647 F.2d 876 (9th Cir.) (en banc), cert. denied, 449 U.S. 903 (1980). Agosto therefore conflicts squarely with its own circuit's en banc precedent. It is not surprising that in her dissent, Judge Mansmann, although apparently approving of the reasoning in Agosto and citing to it on pages 11 and 18 n.17, is no more persuaded by Agosto than we are.

In Greenberg, a mother sought relief from a civil contempt charge when she refused to testify before a federal grand jury in order to protect her adult daughter, who had been indicted by a Florida grand jury for importation of marijuana. See Greenberg, 11 Fed. R. Serv. at 580. The district court recognized a limited testimonial privilege grounded in the First Amendment free exercise clause; however, the court declined to recognize a general common-law parent-child privilege.

Observing that the daughter, as an adult, did not require the same degree of guidance and support as a young child, the court reasoned that although compelled disclosure of nonincriminating confidences might damage the relationship between the mother and her daughter, the harm would be less severe than if an unemancipated minor were involved. See id. at 586-87. Concluding that this lesser degree of harm did not outweigh the state's need for the testimony, the district court held that the facts did not justify the creation of a common-law parent-child privilege. See id. at 587. Greenberg therefore does not support the creation of a general testimonial parent-child privilege; furthermore, its limited holding does not extend to the present matter since religious principles are not implicated here.

## B. THE STANDARDS PRESCRIBED BY FEDERAL RULE OF EVIDENCE 501 DO NOT SUPPORT THE CREATION OF A PRIVILEGE.

Federal Rule of Evidence 501 provides that "the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." No such principle, interpretation, reason or experience has been drawn upon here.

It is true that Congress, in enacting Fed. R. Evid. 501, "manifested an affirmative intention not to freeze the law of privilege. Its purpose rather was to 'provide the courts with

22

the flexibility to develop rules of privilege on a case-by-case basis,' and to leave the door open to change." Trammel v. United States, 445 U.S. 40, 47 (1980) (quoting 102 Cong. Rec. 40,891 (1974) (statement of Rep. William Hungate)). In doing so, however, we are admonished that privileges are generally disfavored;[16] that "'the public . . . has a right to every man's evidence'";[17] and that privileges are tolerable "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."[18]

In keeping with these principles, the Supreme Court has rarely expanded common-law testimonial privileges.[19] Following

---

16. See, e.g., In re Dinnan, 661 F.2d 426, 427 (5th Cir. 1981) ("The basis of justice is truth and our system frowns upon impediments to ascertaining that truth."), cert. denied sub nom. Dinnan v. Blaubergs, 457 U.S. 1106 (1982).

17. Trammel, 445 U.S. at 50 (quoting United States v. Bryan, 339 U.S. 323, 331 (1950)).

18. Trammel, 445 U.S. at 47 (internal quotation omitted).

19. See, e.g., Trammel, 445 U.S. at 53 (narrowing husband-wife privilege and holding that witness spouse may testify over the objections of the other spouse); University of Pa. v. EEOC, 493 U.S. 182, 189 (1990) (declining to recognize a privilege for academic peer review proceedings); United States v. Arthur Young & Co., 465 U.S. 805, 817-19 (1984) (rejecting an accountant work-product privilege); United States v. Gillock, 445 U.S. 360, 367-68 (1980) (expressly refusing to recognize a privilege for state legislators in federal court); United States v. Nixon, 418 U.S. 683, 709 (1974) (rejecting a privilege for confidential communications between the President and the President's high-level advisors); Couch v. United States, 409 U.S. 322, 335 (1973) (rejecting an accountant-client testimonial privilege).

23

the Supreme Court's teachings, other federal courts, including this court, have likewise declined to exercise their power under Rule 501 expansively.  See, e.g., United States v. Schoenheinz, 548 F.2d 1389, 1390 (9th Cir. 1977) (declining to recognize an employer-stenographer privilege); In re Grand Jury Impaneled on January 21, 1975, 541 F.2d 373, 382 (3d Cir. 1976) (declining to recognize a required-reports privilege).

Neither the appellants nor the dissent has identified any principle of common law, and hence have proved no interpretation of such a principle.  Nor has the dissent or the appellants discussed any common-law principle in light of reason and experience.  Accordingly, no basis has been demonstrated for this court to adopt a parent-child privilege.

**C. CREATING A PARENT-CHILD PRIVILEGE WOULD BE INCONSISTENT WITH THE TEACHINGS OF THE SUPREME COURT AND OF THIS COURT.**

1. Supreme Court

The Supreme Court's most recent pronouncement in the law of privileges, Jaffee v. Redmond, 116 S. Ct. 1923 (1996), which recognized a psychotherapist-patient privilege, supports the conclusion that a privilege should not, and cannot, be created here.  In Jaffee, the Supreme Court reemphasized that the predominant common-law principle which guides a federal court's determination of whether a privilege applies is the maxim that testimonial privileges are disfavored:

The common-law principles underlying the recognition of testimonial privileges can be stated simply.  "'For

24

more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.'"

Id. at 1928 (quoting United States v. Bryan, 339 U.S. 323, 331 (1950) (quoting 8 John H. Wigmore, Evidence § 2192, at 64 (3d ed. 1940))). An exception to this general rule is justified only when recognition of a privilege would promote a "'public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'" Id. (quoting Trammel, 445 U.S. at 50 (quoting Elkins v. United States, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting))).

The Jaffee Court emphasized that a court, in determining whether a particular privilege "'promotes sufficiently important interests to outweigh the need for probative evidence,'" Id. (quoting Trammel, 445 U.S. at 51), must be guided by "reason and experience." Specifically, the Jaffee Court instructed that a federal court should look to the "experience" of state courts: "[T]he policy decision of the States bear on the question [of] whether federal courts should recognize a new privilege or amend the coverage of an existing one." Id. at 1929-30.

Notably, in recognizing a psychotherapist-patient privilege, the Supreme Court relied on the fact that all fifty

25

states had enacted some form of a psychotherapist privilege. Id. at 1929 & n.11 (listing state statutes). The Jaffee Court explained that "it is appropriate to treat a consistent body of policy determinations by state legislatures as reflecting both 'reason' and 'experience.'" Id. at 1930.

Here, by contrast, only four states have deemed it necessary to protect from disclosure, in any manner, confidential communications between children and their parents. As previously noted, New York state courts have recognized a limited parent-child privilege, and Idaho and Minnesota have enacted limited statutory privileges protecting confidential communications by minors to their parents. See supra notes 13 & 15. In Massachusetts, as we have noted, minor children are statutorily disqualified from testifying against their parents in criminal proceedings. See id. No state within the Third Circuit has adopted a parent-child privilege.

The policy determinations of these four states do not constitute a "consistent body of policy determinations by state[s]" supporting recognition of a parent-child privilege. Indeed, if anything, the fact that the overwhelming majority of states have chosen not to create a parent-child privilege supports the opposite conclusion: "reason and experience" dictate that federal courts should refuse to recognize a privilege rejected by the vast majority of jurisdictions.

26

The _Jaffee_ Court also relied on the fact that the psychotherapist-patient privilege was among the nine specific privileges recommended by the Advisory Committee on Rules of Evidence in 1972. See _Jaffee_, 116 S. Ct. at 1928-30 & n.7; see also _Proposed Rules of Evidence for the United States Courts and Magistrates_, 56 F.R.D. 183, 230-61 (1973). Additionally, the _Jaffee_ Court noted: "[O]ur holding [_United States v. Gillock_, 445 U.S. 360 (1980)] that Rule 501 did not include a state legislative privilege relied, in part, on the fact that no such privilege was included in the Advisory Committee's draft [of the proposed privilege rules]." _Jaffee_, 116 S. Ct. at 1930.

In the instant cases, in contrast to the psychotherapist-patient privilege recognized in _Jaffee_, the parent-child privilege, like the state legislative privilege rejected in _Gillock_, was not among the enumerated privileges submitted by the Advisory Committee. Although this fact, in and of itself, is not dispositive with respect to the question as to whether this court should create a privilege, it strongly suggests that the Advisory Committee, like the majority of state legislatures, did not regard confidential parent-child communications sufficiently important to warrant "privilege" protection.

A federal court should give due consideration, and accord proper weight, to the judgment of the Advisory Committee and of state legislatures on this issue when it evaluates whether

27

it is appropriate to create a new privilege pursuant to Rule 501.

### 2. Third Circuit

Under the analytic framework set forth in this court's precedents, creating a parent-child privilege would be ill-advised. In In re Grand Jury Investigation, 918 F.2d 374 (3d Cir. 1990) (Becker, J.), we adopted a clergy-communicant privilege. We did so, however, only after examining the state and federal precedents addressing the issue of a clergy-communicant privilege and after determining that these precedents, on balance, weighed in favor of recognizing such a privilege. Id. at 379-84. Indeed, we instructed that an examination of such precedents was mandatory:

> Both the history and the language of Rule 501, therefore, provide us with a mandate to develop evidentiary privileges in accordance with common law principles. This mandate, in turn, requires us to examine federal and state case law and impels us to consult treatises and commentaries on the law of evidence that elucidate the development of the common law.

Id. at 379.

Moreover, like the Jaffee Court and perhaps in anticipation of Jaffee's instructions, Judge Becker considered the "reason and experience" of the state legislatures and of the Advisory Committee. First, Judge Becker, writing for a unanimous panel, noted that "virtually every state has recognized some form of a clergy-communicant privilege." Id. at 381 & n.10 (listing state statutes).

28

In addition, Judge Becker posited that "the proposed rules prove a useful reference point and offer guidance in defining the existence and scope of evidentiary privileges in the federal courts." Id. at 380. Judge Becker further explained:

"[I]n many instances, the proposed rules, [used as] [s]tandards, remain a convenient and useful starting point for examining questions of privilege. The [s]tandards are the culmination of three drafts prepared by an Advisory Committee consisting of judges, practicing lawyers and academicians. . . . Finally, they were adopted by the Supreme Court. . . .

. . . .
. . . [T]he Advisory Committee in drafting the Standards was for the most part restating the law currently applied in the federal courts.

Id. at 380-81 (quoting J. Weinstein & M. Berger, Weinstein's Evidence ¶ 501[03] (1987)). Judge Becker then concluded that "[t]he inclusion of the clergy-communicant privilege in the proposed rules, taken together with its uncontroversial nature, strongly suggests that [that] privilege is, in the words of the Supreme Court, 'indelibly ensconced' in the American common law." Id. at 381 (quoting Gillock, 445 U.S. at 368). Judge Becker also provided a detailed exegesis of the historical development of the clergy-communicant privilege, stressing that common-law tradition, as reflected in practice and case law, supported recognition of such a privilege.

In contrast, the parent-child privilege sought to be recognized here is of relatively recent vintage, see Ismail, 756 F.2d at 1257-58 ("The parent-child privilege did not exist at common law"), and is virtually no more than the product of legal

academicians.  See supra note 12.  Unlike, for example, the

attorney-client privilege, which is "the oldest" common-law

privilege, see United States v. Zolin, 491 U.S. 554, 562 (1989);

Upjohn Co. v. United States, 449 U.S. 383, 389 (1981), the

parent-child privilege lacks historical antecedents.

Furthermore, an analysis of the four Wigmore factors,

which Judge Becker used to buttress this court's disposition in

In re Grand Jury Investigation, does not support the creation of

a privilege.  Dean Wigmore's four-factor formula requires

satisfaction of all four factors in order to establish a

privilege:
(1) The communications must originate in a confidence that
    they will not be disclosed.
(2) This element of confidentiality must be essential to the
    full and satisfactory maintenance of the relation
    between the parties.
(3) The relation must be one which in the opinion of the
    community ought to be sedulously fostered.
(4) The injury that would inure to the relation by the
    disclosure of the communications must be greater than
    the benefit thereby gained for the correct disposal of
    litigation.

In re Grand Jury Investigation, 918 F.2d at 384 (quoting 8 John

H. Wigmore, Evidence § 2285 (J. McNaughton rev. ed. 1961))

(emphasis in original) (footnote omitted).

At least two of Wigmore's prerequisite conditions for

creation of a federal common-law privilege are not met under the

facts of these cases.  We refer to the second and fourth elements

of the Wigmore test.[20]

20.  The most recent case addressing a parent-child privilege
analyzed the privilege under the Wigmore four-factor test, and

30

First, confidentiality--in the form of a testimonial privilege--is not essential to a successful parent-child relationship, as required by the second factor. A privilege should be recognized only where such a privilege would be indispensable to the survival of the relationship that society deems should be fostered. For instance, because complete candor and full disclosure by the client is absolutely necessary in order for the attorney to function effectively, society recognizes an attorney-client privilege. Without a guarantee of secrecy, clients would be unwilling to reveal damaging information. As a corollary, clients would disclose negative information, which an attorney must know to prove effective representation, only if they were assured that such disclosures are privileged.

In contrast, it is not clear whether children would be more likely to discuss private matters with their parents if a parent-child privilege were recognized than if one were not. It is not likely that children, or even their parents, would typically be aware of the existence or non-existence of a testimonial privilege covering parent-child communications. On the other hand, professionals such as attorneys, doctors and members of the clergy would know of the privilege that attends their respective profession, and their clients, patients or

(..continued)
declined to adopt the privilege after determining that the privilege failed to satisfy two of the four factors - the same factors which are not satisfied here. See In re Inquest Proceedings, 676 A.2d 790 (Vt. 1996).

parishioners would also be aware that their confidential conversations are protected from compelled disclosure.[21]

Moreover, even assuming _arguendo_ that children and their parents generally are aware of whether or not their communications are protected from disclosure, it is not certain that the existence of a privilege enters into whatever thought processes are performed by children in deciding whether or not to confide in their parents. Indeed, the existence or nonexistence of a parent-child privilege is probably one of the least important considerations in any child's decision as to whether to reveal some indiscretion, legal or illegal, to a parent. Moreover, it is unlikely that any parent would choose to deter a child from revealing a confidence to the parent solely because a federal court has refused to recognize a privilege protecting such communications from disclosure.

---

21. Notably, the Advisory Committee on the Rules of Evidence reached a similar conclusion with respect to a marital communications privilege. The Advisory Committee explained:

> [Proposed Rule 505] recognizes no privilege for confidential communications [between spouses]. . . . [It cannot] be assumed that marital conduct will be affected by a privilege for confidential communications of whose existence the parties in all likelihood are unaware. The other communication privileges, by way of contrast, have as one party a professional person who can be expected to inform the other of the existence of the privilege.

Proposed Fed. R. Evid. 505 advisory committee's note, 56 F.R.D. at 245-46.

Finally, the proposed parent-child privilege fails to satisfy the fourth condition of the Wigmore test. As explained above, any injury to the parent-child relationship resulting from non-recognition of such a privilege would be relatively insignificant. In contrast, the cost of recognizing such a privilege is substantial: the impairment of the truth-seeking function of the judicial system and the increased likelihood of injustice resulting from the concealment of relevant information. See United States v. Nixon, 418 U.S. 683, 709 (1974) (stating that "[t]he need to develop all relevant facts in the adversary system is both fundamental and comprehensive").

Moreover, because no clear benefit flows from the recognition of a parent-child privilege, any injury to the parent-child relationship caused by compelled testimony as to confidential communications is necessarily and substantially out-weighed by the benefit to society of obtaining all relevant evidence in a criminal case. See, e.g., In re Inquest Proceedings, 676 A.2d 790, 793 (Vt. 1996) (finding that although harm may result from disclosure of a child's confidence, such harm does not outweigh "the public interest in seeking the truth within the context of a criminal investigation"); State v. Maxon, 756 P.2d 1297, 1301 (Wash. 1988) (stating that the loss of relevant evidence outweighs the public policy favoring a parent-child privilege). In short, the public good derived from maintaining the confidentiality of parent-child communications

33

transcends the value of effective and efficient judicial truth-finding.

An even more compelling reason for rejecting a parent-child privilege stems from the fact that the parent-child relationship differs dramatically from other relationships.  This is due to the unique duty owing to the child from the parent.  A parent owes the duty to the child to nurture and guide the child.  This duty is unusual because it inheres in the relationship and the relationship arises automatically at the child's birth.

If, for example, a fifteen year old unemancipated child informs her parent that she has committed a crime or has been using or distributing narcotics, and this disclosure has been made in confidence while the child is seeking guidance, it is evident to us that, regardless of whether the child consents or not, the parent must have the right to take such action as the parent deems appropriate in the interest of the child.  That action could be commitment to a drug rehabilitation center or a report of the crime to the juvenile authorities.  This is so because, in theory at least, juvenile proceedings are undertaken solely in the interest of the child.  We would regard it intolerable in such a situation if the law intruded in the guise of a privilege, and silenced the parent because the child had a privilege to prevent disclosure.

This results in the analysis that any privilege, if recognized, must be dependent upon both the parent and child

34

asserting it. However, in such a case, the privilege would disappear if the parent can waive it. It follows therefore that, if a child is able to communicate openly with a parent and seeks guidance from that parent, the entire basis for the privilege is destroyed if the child is required to recognize that confidence will be maintained only so long as the parent wants the conversation to be confidential. If, however, the parent can waive the privilege unilaterally, the goal of the privilege is destroyed. When the Supreme Court authorized a psychotherapist-patient privilege in Jaffee, it told us as much in stating,

> We part company with the Court of Appeals on a separate point. We reject the balancing component of the privilege implemented by that court and a small number of States. Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and evidentiary need for disclosure would eviscerate the effectiveness of the privilege. As we explained in Upjohn, if the purpose of the privilege is to be served, the participants in the confidential conversation 'must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.'

Jaffee v. Redmond, 116 S. Ct. 1923, 1932 (1996) (quoting Upjohn Co. v. United States, 449 U.S. 383, 393 (1981)).

It follows then that an effective parent-child privilege requires that the parent's lips be sealed but such a

35

sealing would be inexcusable in the parent-child relationship.
No government should have that power.

Indeed the obligation on the parent to act goes far
beyond the parent's obligation to raise and nurture the child.
Thus a parent-child privilege implicates considerations which are
vastly different from the traditional privileges to which resort
is had as analogues.

In sum, neither historical tradition, nor common-law
principles, nor Wigmore formulations, nor the logic of
privileges, nor the "reason and experience" of the various states
supports creation of a parent-child privilege.

**D.   RECOGNITION OF A PARENT-CHILD PRIVILEGE SHOULD BE LEFT TO CONGRESS.**

Although we, and our sister courts, obviously have
authority to develop and modify the common law of privileges, we
should be circumspect about creating new privileges based upon
perceived public policy considerations.  This is particularly so
where there exist policy concerns which the legislative branch is
better equipped to evaluate.  To paraphrase Justice Scalia,
writing in dissent in Jaffee, and referring to the psycho-
therapist privilege:

> The question before us today is not whether there should be an
> evidentiary privilege for [parent-child
> communications].  Perhaps there should.  But the
> question before us is whether (1) the need for that
> privilege is so clear, and (2) the desirable contours
> of that privilege are so evident, that it is
> appropriate for this [c]ourt to craft it in common law
> fashion, under Rule 501.

36

<u>Jaffee v. Redmond</u>, 116 S. Ct. 1923, 1940 (1996) (Scalia, J.
dissenting).

The legislature, not the judiciary, is institutionally
better equipped to perform the balancing of the competing policy
issues required in deciding whether the recognition of a parent-
child privilege is in the best interests of society. Congress,
through its legislative mechanisms, is also better suited for the
task of defining the scope of any prospective privilege.[22]

Congress, is able to consider, for example, society's moral,
sociological, economic, religious and other values without being
confined to the evidentiary record in any particular case. Thus,
in determining whether a parent-child privilege should obtain,
Congress can take into consideration a host of facts and factors
which the judiciary may be unable to consider. These
considerations are also relevant to determining whether the
privilege, if it is to be recognized, should extend to adult
children, adopted children or unemancipated minors.[23]

---

22. In a state context, in <u>In re: A & M</u>, 403 N.Y.S. 2d 381 (App.
Div. 1978), the New York Appellate Division expressly declined to
adopt a common-law privilege, explaining: "[A]lthough there are
persuasive arguments to apply a privilege in these circumstances,
we believe that the creation of a privilege devolves exclusively
on the Legislature." <u>Id.</u> (footnotes omitted).
    We recognize, of course, that the Advisory Committee Notes to
the Federal Rules of Evidence provide that privileges shall
continue to be developed by the courts of the United States. <u>See</u>
Fed. R. Evid. 501 advisory committee's notes.

23. Should the privilege be restricted to unemancipated minors
or should it extend to all children, regardless of age,
unemancipated and emancipated? No apposite case, state or
federal, provides a parent-child privilege for adults or
emancipated children. <u>See, e.g.</u>, <u>In re Erato</u>, 2 F.3d 11 (2d Cir.

Among additional factors that Congress could consider are other parameters of familial relationships. Does "parent" include step-parent or grand-parent? Does "child" include an adopted child, or a step-child? Should the privilege extend to siblings? Furthermore, if another family member is present at the time of the relevant communication, is the privilege automatically barred or destroyed? See, e.g., In re Grand Jury Subpoena (Matthews), 714 F.2d at 224-25 (in-laws); United States v. (Under Seal), 714 F.2d at 349 n.4 (brother and cousin).

(..continued)
1993); State v. Willoughby, 532 A.2d 1020 (Me. 1987); In re Gail D., 525 A.2d 337 (N.J. Super. Ct. App. Div. 1987); State v. Maxon, 756 P.2d 1297 (Wash. 1988). Nor do any state statutes provide a privilege for emancipated children. Indeed, both Idaho and Minnesota, by statute, limit their variants of the parent-child privilege to children under age 18. See Idaho Code §§ 9-203(7), 32-101 (1990 & Supp. 1995); Minn. Stat. §§ 595.02(1)(j), 645.451 (1988 & Supp. 1996).

In the present case, of course, the daughter in the Delaware appeals is 16 years old and unemancipated. Hence, the issue of extending the privilege to an adult or an emancipated child is not relevant insofar as the Delaware target is concerned. However, the appellant-son in the Virgin Islands case, who was 18 years old at the time of the relevant communication, and, therefore, no longer a minor nor unemancipated, urges that the privilege be unrestricted with regard to age. Under Virgin Islands law, the son would be deemed emancipated. See V.I. Code Ann. tit. 16, § 261 (providing that the age of majority in the Virgin Islands is 18 years old); V.I. Code Ann. tit. 16, § 221(4) (minor becomes "emancipat[ed]" by reason of having attained the age of majority"); see also In Re Guardianship of Penn, 15 F.3d 292, 295 (3d Cir. 1994) (noting that Virgin Islands legislature, in 1972, lowered the age of majority from 21 to 18); Galvan v. Hess Oil Virgin Islands Corp., 549 F.2d 281, 288 (3d Cir. 1977)(same).

Similarly, federal law would indicate that an individual attains adulthood at the age of 18 years. See 18 U.S.C. § 2255 (1984) (defining "minor" as "any person under the age of 18 years"); 18 U.S.C. § 5031 (Supp. 1996) (defining "juvenile" as a person who has not attained his eighteenth birthday).

38

Hence, as a court without the ability to consider matters beyond the evidentiary record presented, we should be chary about creating new privileges and ordinarily should defer to the legislature to do so.  See, e.g., Branzburg v. Hayes, 408 U.S. 665, 706 (1972) (plurality) (suggesting that courts should yield to legislatures in creating and defining privileges); People v. Dixon, 411 N.W.2d 760, 763 (Mich. Ct. App. 1987) (stating that creation of parent-child testimonial privilege is best left to legislature); In re Parkway Manor Healthcare Ctr., 448 N.W.2d 116, 121 (Minn. Ct. App. 1989) (deferring to legislature to create a privilege for self-evaluation data); Cook v. King County, 510 P.2d 659, 661 (Wash. Ct. App. 1973) ("Although 'privilege' is a common-law concept, the granting of a testimonial privilege is a recognized function of legislative power.").  Indeed, the Supreme Court has explained that one basis for its disinclination to recognize new privileges is deference to the legislature:

> We are especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself.

University of Pennsylvania v. EEOC, 493 U.S. at 189.

Congress too has recognized the importance of privilege rules insofar as the truth-seeking process is concerned.  Congress specifically addressed that subject when it delegated rule-making authority to the Supreme Court as to rules of procedure and evidence.  It did so by identifying and designating the law

of privileges as a special area meriting greater legislative oversight.  Congress expressly provided that "[a]ny . . . rule creating, abolishing, or modifying an evidentiary privilege shall have no force or effect unless approved by Act of Congress."  28 U.S.C. § 2074(b) (1994).  In contrast, all other evidentiary rules promulgated by the Supreme Court and transmitted to Congress automatically take effect unless Congress enacts a statute to the contrary.  See 28 U.S.C. § 2074(a) (1994).[24]

## IV.

A few further observations about the dissent and why it does not persuade us that the parent-child privilege outweighs the government's interest in disclosure:

First, in her dissenting and concurring opinion, Judge Mansmann attempts to distinguish the Virgin Islands appeal (where a father has been subpoenaed to testify about communications made to him by his son who is over the age of eighteen[25]), from the

---

24.  The preferred method by which any Rule of Evidence would be proposed and ultimately promulgated would be by proceeding: first, through the Advisory Committee on Rules of Evidence, then to the Judicial Conference Standing Committee on Practice and Procedure (with public notice and comment at both these stages), then to the Judicial Conference of the United States, and then, of course, to the Supreme Court, which, if the proposed Rule was approved, would then transmit the proposed Rule to Congress for its consideration.  See 28 U.S.C. § 2072, et seq.; 18 U.S.C. §§ 3402, 3771, 3772.

25.  Because the son is over eighteen years of age, under Judge Mansmann's formulation of the privilege, we assume there would have to be a hearing by the district court to assess various factors to determine whether a privilege would lie (since Judge Mansmann declines to adopt a bright-line rule with regard to

40

Delaware appeal (where a teenage daughter has been subpoenaed to give testimony against her father). The record of the Delaware appeal, however, does not inform us as to the nature of the testimony being sought or the nature of the daughter's knowledge. Does it arise from observations, overheard statements, communications with her father, or some other source? If indeed it arises from confidential communications, does the privilege advocated by Judge Mansmann in the Virgin Islands case then apply? If so, is the alleged distinction a valid one, or do both appeals suffer from the same deficiencies we have identified with respect to any parent-child privilege?

Secondly, we note that the Virgin Islands privilege which Judge Mansmann would recognize, while characterized as a limited one, would only come into play where a child has made a confidential communication to a parent in the course of seeking parental advice. See Dissenting Opinion at 7.[26] Both of these

(..continued)
age). These "factors" would include such variables as age, maturity, the child's residence and the precise nature of the communication. See Dissenting Opinion at 7.
We have already discussed the limitation of such a privilege to minors, (see note 23 supra) and know of no case where an adult child and his or her parent have been able to invoke the privilege.

26. We note that, although Judge Mansmann urges that we recognize a privilege in the Virgin Islands case, the record in the Virgin Islands case does not disclose the content of the communication at issue, and reveals no evidence that the son sought advice from his father -- even if one may infer that the son's communication was otherwise confidential in nature. Therefore, although the dissent advocates applying the privilege in the Virgin Islands case, Judge Mansmann fails to identify and thus satisfy her threshold qualification of the child seeking

41

qualifications -- (1) a confidential communication, spoken or written, and (2) arising in the course of seeking parental advice[27] -- would have to be determined by a hearing - a mini-trial - which would have the effect of destroying the confidential nature of the communication (since the communication would have to be divulged so that the district court could determine its precise nature). It would also endow the district court with virtually unlimited discretion in granting or denying the privilege (since the dissent provides little guidance to the district court for making such a determination). The exercise of this discretion would undermine the very essence of a privilege that "the participants in the confidential conversation" can predict "with some degree of certainty" that their conversation will be protected. See Jaffee v. Redmond, 116 S. Ct. 1923, 1932 (1996).

Thirdly, the crafting of the privilege as a jointly-held privilege (by both parent and child) undermines the dissent's goal of encouraging a child to seek the advice of a parent and protecting the parent-child relationship. The entire thrust of the dissent's opinion is that a child should feel

confident, in communicating with a parent to seek advice and
(..continued)
advice from a parent -- a requirement that she identifies as essential for such a privilege.

27. As the dissent frames the privilege, if a child divulges to his parent that he is the Unabomber, a sex offender or an abuser of drugs, and does so without seeking guidance or advice, the privilege would be unavailable.

42

guidance, that the communication will remain inviolate. However, the dissent, then straddling the fence, also argues that the parent can choose to violate such a confidence and report a confidential communication to others (presumably the authorities) in the interest of parental judgment. See Dissenting Opinion at 8 n.6. We know of no privilege that can operate in such a two-way fashion and still remain effective.

The few observations made above do no more than highlight the stark difference between the dissent's view of the public good which subordinates the government's interest in disclosure to a parent-child privilege, and the position we have taken which recognizes justice and disclosure as the predominant principles for ascertaining truth. See Trammel v. United States, 445 U.S. 40, 47 (1980).

Finally, we observe that implicit in the various discussions by courts (both federal and state) of the parent-child privilege is the fact that the "strong and trusting parent-child relationships" which the dissent would preserve, see Dissenting Opinion at 2, have existed throughout the years without the concomitant existence of a privilege protecting that relationship.

**V.**

In short, if a new privilege is deemed worthy of recognition, the wiser course in our opinion is to leave the adoption of such a privilege to Congress.

Although we are not reluctant to chart a new legal course, such an action should not be premised upon unsound legal principles or emotion.  The instant appeals furnish us with neither reason, nor analysis, nor a basis upon which to fashion such a privilege.

All that we have been told by the appellants and by the dissent is:  we should look to the healthy, psychological development of children; and that compelling the testimony of a parent is repugnant and indecent; that it is more important that a child communicate with a parent than it is to compel a parent's testimony; and that the preservation of the family and the protection of a strong and trusting parent-child relationship trumps all other interests.  These conclusions, as well as the criteria which the dissent would require as to the nature of the communications and whether they were imparted in an effort to seek advice and counseling, cannot be satisfied without the benefit of evidence, expert testimony, hearings or recognized authority.  If a new privilege were to be engraved in the concrete of our jurisprudence as the dissent argues, then it should be framed so that its contours are clear and unambiguous, and it should be capable of being applied precisely, without the

44

need for multiple pretrial hearings, in addition to the privilege's existence being known to the participants. Sympathy alone cannot justify the creation of a new and unprecedented privilege which does not meet the standards set by Congress, the Supreme Court and this court.

Accordingly, we will affirm the district court's order of June 19, 1995, which denied the father's motion to quash the grand jury subpoena in the Virgin Islands case (95-7354). We will also affirm the district court's order of September 10, 1996 in the Delaware cases (96-7529 and 96-7530), denying the joint motion to quash the grand jury subpoena and rejecting appellants' claims concerning the Schofield affidavit and in camera review.

IN RE GRAND JURY PROCEEDINGS (IMPOUNDED), No. 95-7354

In Re Grand Jury -- John Doe I, John Doe, II, Nos. 96-7530 and 96-7259

MANSMANN, J., concurring and dissenting.

I write separately because I am convinced that the testimonial privilege issue raised by the Virgin Islands appeal is substantially different from that presented in the Delaware appeals[28] and should be resolved in favor of the targeted son.

---

28.      In the Virgin Islands appeal, a father has been subpoenaed to testify regarding communications made to him by his teenaged son. In the Delaware appeals, on the other hand, a teenaged daughter has been subpoenaed to give testimony, based on her own knowledge, which could implicate her father in a crime; confidential communications between parent and child are not

45

The Virgin Islands appeal, which challenges the denial of a motion to quash a grand jury subpoena, requires that we confront an issue of first impression in our circuit:  should we make available to a parent and child an evidentiary privilege which could be invoked to prevent compelling that parent to testify regarding confidential communications made to the parent by his child in the course of seeking parental advice and guidance?[29] It appears that this precise question is one of first impression in the federal courts.

Because I conclude that the public good at issue, the protection of strong and trusting parent-child relationships, outweighs the government's interest in disclosure, I would exercise the authority granted to the federal courts by Congress under Rule 501 of the Federal Rules of Evidence and would recognize a limited privilege.  Accordingly, I respectfully dissent.

(..continued)
alleged in the Delaware appeals.  As I will explain, the privilege question to be resolved in the Virgin Islands appeal focuses on the confidential communication made by a child in the course of seeking parental advice.  Consequently, it is more narrow and more compelling than that presented in the Delaware appeals.

29.      The majority contends that the record in the Virgin Islands matter "reveals no evidence that the son sought advice from his father."  (Typescript at 40 n.25.)  This is incorrect. In the Motion to Quash filed by the son, the son refers to the fact that he "spoke privately with his father, seeking his father's counsel about the matters which are the subject of the Grand Jury's investigation."

This case, unlike most which we consider, does not require that we apply the law as it exists with respect to testimonial privilege.  Instead, we are asked to determine what the law in this area ought to be.  While most courts have declined to recognize a parent-child testimonial privilege, they have done so in contexts far different from the one presented here.  I am convinced that this is an appropriate case in which to recognize and set parameters for a limited privilege.  Doing so is critical to several important public policy interests such as the "protection of strong and trusting parent-child relationships and the preservation of the sanctity of the family. . . ."  Appellant's Brief at 8.  The recognition of a parent-child privilege is essential to "the healthy psychological development of children and to the development of society as a whole"; compelling a parent to testify adversely to a child is "`repugnant to social sensibilities' and contrary to a democratic view of decency."  Wendy Meredith Watts, The Parent-Child Privilege:  Hardly a New or Revolutionary Concept, 28 Wm. & Mary L. Rev. 583, 611-13 (1987).

These and other related public policy arguments have been advanced in a spate of articles by academicians and other legal commentators who, virtually uniformly, favor incorporating a parent-child testimonial privilege into the fabric of the law.[30]

30.        See Maj. Op.  (Typescript at 13 n.11).

47

The courts, however, federal and state, have been reluctant to make these policy arguments the foundation for a "new" privilege. In the circumstances presented here, I do not share that reluctance and am convinced that where compelled testimony by a parent concerns confidential statements made to the parent by his child in the course of seeking parental advice and guidance, it is time to chart a new legal course.

## II.
### A.

Any inquiry concerning the federal court's extension of testimonial privilege necessarily begins with Rule 501 of the Federal Rules of Evidence.[31] Under this Rule, as interpreted by the Supreme Court in United States v. Trammel, 445 U.S. 40, 47 (1980), the federal courts are authorized to "develop[] . . . testimonial privileges in federal criminal trials governed by the

---

31.      Rule 501 states:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress, or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principle of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which state law supplies the rule of decision, the privilege of witness, person, government, state or political subdivision thereof shall be determined in accordance with state law.

principles of the common law as they may be interpreted . . . in the light of reason and experience."  In enacting Rule 501, Congress specifically declined to restrict development in the law of privilege to the legislative realm and declined to limit the range of possible privileges.  Congress instead crafted Rule 501 in order to "provide the courts with the flexibility to develop rules of privilege on a case-by-case basis."  It was Congress' intent "to leave the door open to change."  Id.

The courts' role in fostering evolution in the area of testimonial privilege was reinforced recently by the Supreme Court in Jaffee v. Redmond, 1996 WL 315841 at *4 (U.S.) (footnote omitted):

> The Senate Report accompanying the 1974 adoption of the [Federal Rules of Evidence] indicates that Rule 501 "should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship should be determined on a case-by-case basis."  S. Rep. No. 93-1277, p. 13 (1974).  The Rule thus did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to "continue the evolutionary development of testimonial privileges."  Trammel v. United States, 445 U.S. 40, 47 (1980); see also University of Pennsylvania v. EEOC, 493 U.S. 182, 189 (1990).

According to the Court, "the common-law principles underlying the recognition of testimonial privileges can be stated simply."  Id.  Evidentiary privileges are "exceptions to the demand for every man's evidence" and should "not be lightly created nor expansively construed, for they are in derogation of the search for the truth."  United States v. Nixon, 418 U.S. 683, 709-10

49

(1974).  Despite the strictures of this general rule, the federal courts may be justified in recognizing a testimonial privilege where that privilege "promotes sufficiently important interests to outweigh the need for probative evidence."  University of Pennsylvania v. EEOC, 493 U.S. 182, 189 (1990) (quoting Trammel, 445 U.S. at 51).  This is especially appropriate where, as here, there is no indication that Congress, in enacting Rule 501 -- or in any other context -- has evaluated the competing concerns associated with a particular privilege and has rejected that privilege.  See University of Pennsylvania v. EEOC, 493 U.S. 182, 189 (1990).  It is abundantly clear that under Rule 501 and the interpretive caselaw federal courts have authority in appropriate circumstances to modify the availability and scope of testimonial privileges and to recognize new common law privileges.

B.

When a federal court considers extending the scope of a testimonial privilege or recognizing a new privilege, Rule 501 requires that the court engage in a balancing process, weighing the need for confidentiality in a particular communication against the need for relevant evidence in a criminal proceeding. Trammel, 445 U.S. at 50. I am convinced that the public good derived from a child's ability to communicate openly with and to seek guidance from his or her parents is of sufficient magnitude to transcend the judicial system's interest in compelled parental testimony.[32] Recognizing that "our authority is narrow in scope

_____

32. In addition to the balancing test laid out in Trammel, Dean Wigmore has suggested a four-part test for determining whether or not a particular testimonial privilege should be recognized. In order for a privilege to obtain: (1) the communications must originate in a confidence that they will not be disclosed; (2) this element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties; (3) the relation must be one which, in the opinion of society, ought to be sedulously fostered; and (4) the injury that would inure to the relation by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of litigation. 8 John Henry Wigmore, Evidence § 2285 (J. McNaughton rev. ed. 1961); see also In re Grand Jury Investigation, 918 F.2d 374, 383-84 (3d Cir. 1990) (weighing Dean Wigmore's four prerequisites). I part company with the majority in the application of this test and am convinced that the factors analyzed under the Rule 501 balancing test are sufficient to satisfy the Wigmore test as well. The first condition of the Wigmore test is satisfied in that the parent-child relationship is one which naturally gives rise to confidential communication. Second, confidentiality underlies the parent child relationship; mutual trust encourages children to consult parents for guidance with the expectation that the parent will, in appropriate circumstances, honor the confidentiality of those statements. Third, the family unit is the building block of our society and the parent-child relationship is at the core of that family unit. Finally, although the majority disputes this point, I am convinced that

51

and [to] be exercised only after careful consideration in the face of a strong showing of need for the privilege," In re Grand Jury Proceedings, 918 F.2d 374, 383 (3d Cir. 1990), I stress that the privilege which I would recognize is a limited one, applying only to compelled testimony concerning confidential communications made to a parent by his child in the course of seeking parental advice. Although this case might have been more compelling had the son been a minor at the time of his statements to his father, I would not adopt a bright-line rule applicable only to those who have not reached legal majority. In order to advance the policy interests which the targeted son articulated, I would prefer to leave the particular factors to be considered in determining application of the privilege to development on a case-by-case basis. I expect that these factors would include such variables as age, maturity, whether or not the child resides with the parents, and the precise nature of the communications for which the privilege is claimed. The privilege would apply to situations in which it is invoked by both parent and child; this case does not require that we confront applicability of the privilege where it is invoked by the parent or the child alone.

The goal in recognizing this limited privilege would not be to guarantee confidentiality per se but to shield parent-child relationships from the devastating effects likely to be
(..continued)
the damage resulting from compelling a parent to testify against his child, in most if not all cases, outweighs the benefit associated with correct disposal of the litigation.

associated with compelled testimony.  As one commentator has written:

> [T]o conceive of . . . privileges merely as exclusionary rules, is to start out on the wrong road and, except by happy accident, to reach the wrong destination.  They are, or rather by chance of litigation may become, exclusionary rules; but this is incidental and secondary.  Primarily they are a right to be let alone, a right to unfettered freedom, in certain narrowly prescribed relationships, from the state's coercive or supervisory powers. . . .

Louisell, Confidentiality, Conformity, and Confusions: Privileges in Federal Court Today, 31 Tul. L. Rev. 101, 110-11 (1956).  An effective parent-child relationship is one deserving of protection.  It rests upon a relationship of mutual trust where the child has the right to expect that the parent will act in accordance with the child's best interest.[33]  If the state is permitted to interfere in that relationship by compelling parents to divulge information conveyed to them in confidence by their children, mutual trust, and ultimately the family, are threatened.

---

33.      While it is true, as the majority says, that few children are likely to be aware of a privilege per se, there is, in any event, a certain expectation that this information will not be disclosed.

As the majority points out, there may be circumstances in which a parent, having heard communications from a child, decides that it is in the child's best interest that those communications be divulged.  The privilege which I advocate would not interfere with that parental judgment.  Presumably, if the parent is indeed acting in the child's best interest, disclosure will not ultimately threaten the family relationship which I seek to protect.  Furthermore, if the parent is willing to disclose information which may harm the child, the relationship is already beyond the need for protection.

While I am aware that the availability of even this limited parent-child privilege may, in some rare circumstances, complicate a criminal fact-finding proceeding, I am convinced that the risk is one well worth bearing. "[T]o reach the truth at the cost of the parent-child relationship would be to win the battle and lose the war." Wendy Meredith Watts, The Parent-Child Privileges: Hardly a New or Revolutionary Concept, 28 Wm. & Mary L. Rev. 583, 609 (1987). This is especially true where, as here in the Virgin Islands case, the parent is not a co-defendant or a co-witness to a criminal act, and is not alleged to be hiding the instrumentality or the fruits of a criminal act.

I cannot agree with the majority that testimonial privileges must be regarded as automatic impediments to the effectiveness of the judicial system. In limited circumstances these privileges are critical to important policy interests. I am convinced, as was the district court, that "youngsters today are increasingly faced with excruciatingly dangerous and difficult situations" and that "the law ought to do everything possible to encourage children to confide in their parents and turn to [them] in times of trouble." In re Grand Jury Proceeding, Misc. No. 95-009, at 9, 10 (D.V.I. June 19, 1995).

C.

The spousal privilege is the only testimonial privilege based on a familial relationship to have received general

54

acceptance in the federal courts.[34]  See In re Erato, 2 F.3d 11,

16 (2d Cir. 1993).  In arguing that we should uphold the father's

claim of privilege in this case, I am motivated by many of the

same concerns which underlie the spousal privilege.[35]  The policy

advanced by the spousal privilege "is the protection of the

marital confidences, regarded as so essential to the preservation

of the marriage relationship as to outweigh the disadvantages to

the administration of justice which the privilege entails."

Wolfle v. United States, 291 U.S. 7, 14 (1934).  Similar concerns

are present here:

34.        Four relationship-based privileges have received
federal court recognition:  those between penitent and priest,
attorney and client, physician and patient, and, most recently,
the privilege between therapist and patient.  See Trammel v.
United States, 445 U.S. 40, 51 (1980), and Jaffee v. Redmond,
1996 WL 315841 (U.S.).

35.        Some commentators have sought to analogize the parent-
child privilege to the more widely recognized professional
testimonial privileges such as that between attorney and client,
priest and penitent, and physician and patient:

The parent-child relationship is analogous to the privileged
    professional relationships in many respects.  As the
    professional exercises his skill in the delicate
    relationship with his client, the parent plays a unique
    and sensitive role in the life of his "client," the
    child.  In fulfilling this role, the parent must assume
    many of the same responsibilities as professionals.
    The parent, for example, often must serve as the
    child's legal advisor, spiritual counselor, and
    physical and emotional health expert.  The necessity
    for confidentiality is comparable to that within the
    professional relationships.  Like the attorney, priest,
    or psychiatrist, parents must establish an atmosphere
    of trust to facilitate free and open communication.

Gregory W. Franklin, Note, The Judicial Development of the
Parent-Child Testimonial Privilege:  Too Big for its Britches?
26 Wm. & Mary L. Rev. 145, 151 (1984).

Ideally, the child-parent relationship encompasses aspects
     of the marital relationship -- mutual love, affection,
     and intimacy . . . the parent providing emotional
     guidance and the child relying on him for help and
     support. . . . As in the marital . . . relation[ship],
     this optimal child-parent relationship cannot exist
     without a great deal of communication between the two.
     . . . Manifestly, the parent's disclosure of such
     information to a third party, . . . would deter
     continued communication between child and parent.

Comment, The Child-Parent Privilege:  A Proposal, 47 Fordham L.

Rev. 771, 781 (1979).  The reasoning of the district court in In

Re Agosto, 553 F. Supp. 1298, 1325 (D. Nev. 1983), is also

instructive:
There is no reasonable basis for extending a testimonial
     privilege for confidential communications to spouses,
     who enjoy a dissoluble legal contract, yet denying a
     parent . . . the right to claim such a privilege to
     protect communications made within an indissoluble
     family unit, bonded by blood, affection, loyalty, and
     tradition.  And further, if the rationale behind the
     privilege of a witness-spouse to refuse to testify
     adversely against his or her spouse in a criminal
     proceeding serves to prevent the invasion of the
     harmony and privacy of the marriage relationship
     itself, then affording the same protection to the
     parent-child relationship is even more compelling.

     The Court in Trammel also recognized that privileges

"affecting marriage, home and family relationships," 445 U.S. at

48, are especially worthy of consideration.[36]  Within the family

36.     While the majority opinion distinguishes the privilege
which I would recognize from those involving professional
relationships, it does not address the parallels which exist
between a parent-child privilege and the spousal privilege.  In
Trammel v. United States, 445 U.S. 40 (1980), the Supreme Court
held that in federal courts, the spousal privilege belongs solely
to the spouse who is a witness.  "The court concluded that the
justification for the privilege -- prevention of marital discord
-- was not served by allowing the defendant spouse to prevent the
voluntary testimony of the witness spouse . . . .  The court
noted that state law was moving toward granting the privilege

structure but beyond the marital partners, I can think of no relationship more fundamental than that between parent and child. Society has an interest in protecting the family structure; the parent-child relationship is amenable to identification and segregation for special treatment.

D.

The parent-child privilege is not a novel or radical concept. "Both ancient Jewish law and Roman law entirely barred family members from testifying against one another based on a desire to promote the solidarity and trust that support the family unit. The Napoleonic Code also prevented the disclosure of confidences between family members." J. Tyson Covey, Note, Making Form Follow Function: Considerations in Creating and Applying a Statutory Parent-Child Privilege, 1990 U. Ill. L. Rev. 879, 883. The civil law countries of Western Europe including France, Sweden, and the former West Germany also recognize a privilege covering compelled testimony from family members. Id.

(..continued)
solely to the witness. . . ." Developments in the Law -- Privileged Communications, 98 Harv. L. Rev. 1450, 1568 (1985). The goal of protecting family relationships is paramount in the case now before us; the privilege which I would recognize is based on concerns broader than the guarantee of confidentiality. As the caselaw with respect to spousal privilege establishes, a privilege may indeed advance these broader familial interests without requiring that the child be allowed to silence a parent who is willing to testify.

57

Three states (Idaho, Massachusetts and Minnesota) have adopted some variant of the parent-child privilege by statute,[37] and one state, New York, has judicially recognized the privilege. In re A&M, 403 N.Y.S.2d 375, 61 A.2d 426 (1978).[38] Furthermore,

---

37.     The Idaho statute limits the privilege to communications by minors to their parents.  It provides in relevant part:

Any parent, guardian or legal custodian shall not be forced
    to disclose any communication made by their minor child
    or ward to them concerning matters in any civil or
    criminal action to which such child or ward is a party.
     Such matters so communicated shall be privileged and
    protected against disclosure . . . .

Idaho Code § 9-203(7) (1990 & Supp. 1995).

    In Massachusetts, a minor child is deemed incompetent to testify against her parent in a criminal proceeding:

An unemancipated, minor child, living with a parent, shall
    not testify before a grand jury, trial of an
    indictment, complaint or other criminal proceeding,
    against said parent, where the victim in such
    proceeding is not a member of said parent's family and
    who does not reside in the said parent's household.

Mass. Gen. L. ch. 233, § 20 (1986 & Supp. 1996).

    Minnesota also recognizes a limited parent-child (minor) privilege:

A parent or the parent's minor child may not be examined as
    to any communication made in confidence by the minor to
    the minor's parent.  A communication is confidential if
    made out of the presence of persons not members of the
    child's immediate family living in the same household.

Minn. Stat. § 595.02(1)(i) (1988 & Supp. 1996).

38.     The decision in this case rested on constitutional grounds.  See also  People v. Fitzgerald, 422 N.Y.S.2d 309, 314 (Westchester County Ct. 1979) (parent-child privilege flows from U.S. and New York State Constitutions).

our review of the caselaw convinces us that although a number of

courts have declined to recognize a parent-child privilege in one

form or another, the vast majority of those cases, indeed all of

the federal cases, are distinguishable, on significant grounds,

from the case before us.

Most cases discussing the availability of a parent-child

privilege have done so in the context of whether a child should

be compelled to testify against a parent.[39]  As the court of

appeals acknowledged in In re Grand Jury Proceedings (Starr), 647

F.2d 511, 513 n.4 (5th Cir. 1981), cases involving testimony by a

child regarding activities of or communications by a parent are

not as compelling as cases "involv[ing] confidential

communications from the chid to the parent" because the former do

not implicate "the desire to avoid discouraging a child from

---

39.      See, e.g., Grand Jury Proceedings of John Doe v. United
States, 842 F.2d 244 (10th Cir.), cert. denied, 488 U.S. 894
(1988); United States v. Davies, 768 F.2d 893 (7th Cir.), cert.
denied sub nom. Kaprelian v. United States, 474 U.S. 1008 (1985);
United States v. Ismail, 756 F.2d 1253 (6th Cir. 1985); In re
Grand Jury Subpoena of Santarelli, 740 F.2d 816 (11th Cir. 1984);
In re Matthews, 714 F.2d 223 (2d Cir. 1983) (defendant compelled
to testify against in-laws); United States v. (Under Seal), 714
F.2d 347 (4th Cir.), cert. denied, 464 U.S. 978 (1983); United
States v. Jones, 683 F.2d 817 (4th Cir. 1982); In re Grand Jury
Proceedings (Starr), 647 F.2d 511 (5th Cir. Unit A 1981); United
States v. Penn, 647 F.2d 876 (9th Cir.), cert. denied, 449 U.S.
903 (1980); Gibbs v. State, 426 N.E.2d 1150 (Ind. App. 1981);
State v. Gilroy, 313 N.W.2d 513 (Iowa 1981); Three Juveniles v.
Commonwealth, 455 N.E.2d 1203 (Mass. 1983), cert. denied sub nom.
Keefe v. Massachusetts, 465 U.S. 1068 (1984); People v. Amos, 414
N.W.2d 147 (Mich. Ct. App. 1987); Cabello v. State, 471 So.2d 332
(Miss. 1985), cert. denied, 476 U.S. 1164 (1986); De Leon v.
State, 684 S.W.2d 778 (Tex. Ct. App. 1984).  This is, of course,
also the situation presented by the Delaware appeals.

confiding in his parents."  A similar theme is echoed in Three Juveniles v. Commonwealth, 455 N.E.2d 1203, 1206 (Mass. 1983), cert. denied sub nom Keefe v. Massachusetts, 465 U.S. 1068 (1984):  "Because a parent does not need the advice of a minor child in the same sense that a child may need the advice of a parent, the case for a testimonial privilege as to confidential communications from parent to child seems weaker than the case as to such a communication from child to parent."  This distinction separates the Virgin Islands and Delaware appeals.

A second set of cases refusing to recognize a parent-child privilege involve children who were significantly older than the son in this case and did not implicate communications seeking parental advice and guidance.[40]  As the Court of Appeals for the Second Circuit has recognized, these cases, too, "present[] a

---

40.       See In re Erato, 2 F.3d 11, 12 (2d Cir. 1993) (child is 52); State v. Willoughby, 532 A.2d 1020, 1021 (Me. 1987) ("At the time of the murder [the son] was in his early twenties and was no longer living at the family home . . . ."); In re Gail D., 525 A.2d 337, 337 (N.J. Super. A.D. 1987) (defendant's father is 84 years old); State v. Maxon, 756 P.2d 1297 (Wash. 1988) (en banc).

While I recognize that the son in this case was 18 and, therefore, under Virgin Island law had reached the "age of majority" at the time of the confidential communication, 16 V.I.C. § 261 ("All persons are deemed to have arrived at the age of majority at the age of 18 years, and thereafter shall have control of their own actions and businesses and have all the rights and be subject to all the liabilities of persons of full age."), I find it significant that the son was living at home when the communications were made.  I also find critical the district court's statement that, "It is apparent . . . that the confidential communications which ensued were in the nature of a child seeking advice from his father with whom he shared a close and trusting relationship.  In re Grand Jury Proceeding, Misc. No. 95-0009, at 10 n.5

60

weaker claim for recognition of a parent child privilege. . . ."

 In re Erato, 2 F.3d 11, 16 (2d Cir. 1993).

    Several cases evaluating a claim of privilege did not have

the benefit of the balancing process embodied in Rule 501 of the

Federal Rules of Evidence[41] and others did not involve

confidential communications made by a child to a parent.[42]

Finally, a number of cases rejecting the parent-child privilege

involved defendants who sought to bar voluntary testimony offered

41.        See Port v. Heard, 764 F.2d 423, 428 (5th Cir. 1985)
(Parties "do not rely on Fed. R. Evid. 501; were this a Rule 501
case our holding might be different since, in terms of the
interests at stake, this case presents a compelling argument in
favor of recognition."); In re Kinoy, 326 F. Supp. 407 (S.D.N.Y.
1971) (decision issued four years before enactment of Fed. R.
Evid. 501); In re Terry W., 130 Cal. Rptr. 913, 915 (power to
recognize parent-child privilege did not belong to the court
under express provision of state statute); Marshall v. Anderson,
459 So.2d 384, 386 (Fla. Dist. Ct. App. 1984) ("Directly unlike
the federal courts, which under Rule 501 of the Federal Rules of
Evidence are granted `the flexibility to develop rules of
privilege on a case-by-case basis . . . and to leave the door
open to change,' the courts of Florida are statutorily forbidden
to do so.") (citation omitted).

42.        See Penn, 647 F.2d at 879 (defendant sought suppression
of drug evidence after police officer offered 5-year-old child
five dollars to show where drugs were concealed); United States
v. Duran, 884 F. Supp. 537, 541 (D.D.C. 1995) (defendant sought
exclusion of letter written to his son under parent-chid
privilege); People v. Sanders, 457 N.E.2d 1241, 1243 (Ill. 1983)
(defendant sought exclusion of communication with his wife in
front of their children), rev'd on other grounds, 457 N.E.2d 1241
(Ill. 1983); State v. Gilroy, 313 N.W.2d 513, 518 (Iowa 1981)
(defendant objected when his daughter was called as a witness on
behalf of the state); People v. Amos, 414 N.W.2d at 148
(privilege invoked by defendant mother to prevent son's adverse
testimony); State v. Bruce, 655 S.W.2d 66, 68 (Mo. Ct. App. 1983)
(defendant sought to bar testimony by prison guard about
conversation between defendant and his mother in front of the
guard).

by their parents.[43]  These cases do not present the threat to the family relationship posed in the case before us.  The importance of this distinction was summarized by the Illinois Supreme Court in People v. Sanders, 457 N.E.2d 1241, 1246 (Ill. 1983).  The court in Sanders wrote that cases in which the parent-child privilege has been upheld have

> relied heavily upon conjecture that a family member who is forced to testify against her will would face the unpleasant choice of aiding the criminal conviction of a loved one, perjuring herself on the stand, or risking a citation for contempt of court for refusing to testify and the belief that the harshness of this choice has the effect of undermining the family relationship.  Such a fear is without foundation where, as in this case, the witness who is a family member volunteers her testimony.  The voluntariness of the act is strong evidence that the choice the witness faced was an easy one for her to make.

## III.

While there is a substantial body of authority in which courts have declined to recognize a parent-child privilege, none of the cases addresses under Rule 501 of the Federal Rules of Evidence the issue of a parent's compelled testimony with respect to confidential advice-seeking statements made to the parent by

---

43.      See, e.g., In re Terry W., 130 Cal. Rptr. at 914 n.1 ("The mother did not claim a `parent-child privilege.'"); Cissna v. State, 352 N.E.2d 793, 795 (Ind. Ct. App. 1976); In re Frances J., 456 A.2d 1174, 1177 (R.I. 1983) (noting that "in all of the cases in which the privilege has been recognized, the proponent of the privilege has sought to preclude the compulsion of testimony by a parent.  In the case before us, on the other hand, respondent has sought to inhibit or truncate the cross-examination of her mother who had proposed to testify voluntarily").

his teenage son .[44]  The facts underlying the Virgin Islands

appeal are critical to my conclusion that we should recognize a

_____

44.        This case is also distinguishable from the only two
federal decisions to have recognized some form of parent-child
privilege.  In In re Grand Jury Proceedings (Greenberg), 11 Fed.
R. Evid. Serv. (Callaghan) 579 (D. Conn. 1982), a mother asserted
a testimonial privilege to prevent being compelled to testify
before a grand jury against her adult daughter.  The privilege
asserted was based on the mother's First Amendment free exercise
claim.  Specifically, the mother claimed that as a conservative
Jew, she could not testify against her daughter without violating
a basic tenet of her religion which forbids a parent to testify
against a child.  The district court recognized a parent-child
privilege grounded in the First Amendment, holding that
"requiring Mrs. Greenberg to testify would interfere with her
free exercise of religion, though only to the extent that her
answers would incriminate her daughter."  Id. at 582.  The court
declined to recognize a common-law privilege protecting
confidential parent-child communications in general, however,
noting that although compelled disclosure of non-incriminating
confidences might damage the relationship between the mother and
her daughter, the harm would be less severe than if an
unemancipated minor were involved.  Id. at 586-87.

        In In re Grand Jury Proceedings (Agosto), 553 F. Supp.
1298 (D. Nev. 1983), the district court considered the motion of
a thirty-two year old son to quash a subpoena requiring him to
testify against his father.  In granting the son's motion, the
court recognized an expansive common-law testimonial privilege,
holding that the government's interest in presenting all relevant
evidence does not outweigh "an individual's right of privacy in
his communications within the family unit, nor does it outweigh
the family's interest in its integrity and inviolability."  Id.
at 1325.  The court supported its decision in part by reference
to constitutional law affording protection for the family right
of privacy, id. at 1310, and the "expansive posture taken by
Congress in enacting Federal Rule of Evidence 501."  Id. at 1325.
 While I am in accord with the Agosto court with respect to the
importance of parent-child relationships, I am not prepared to
say that I would reach a similar result on similar facts.  The
case presented in Agosto, involving as it did an adult child's
testimony against a parent, is far less compelling than the case
now before us.  Furthermore, I would decline to adopt a broad
rule of privilege and, recognizing the need for caution and
restraint, have narrowly drawn the privilege which I would
recognize.

narrowly circumscribed parent-child privilege.  The interests involved in protecting the communications at issue here are far stronger than those involved in previous cases.  Consequently, the result which I would reach is not as radical as it might initially appear.

## IV.

I am convinced that the public good to be derived from a circumscribed parent-child testimonial privilege outweighs the judicial system's interest in compelled parental testimony.  I would, therefore, recognize a privilege which could be invoked by a parent and child together to bar compelled testimony concerning confidential communications made to that parent by his child in the course of seeking parental advice and guidance.  I would reverse the district court's order in the Virgin Islands matter denying the motion to quash the grand jury subpoena.

V.

Although I am content with the disposition of the privilege issue in the Delaware matters, I must comment on what is, to me, a disturbing aspect of these appeals.

Appellants in the Delaware cases attack the propriety of the subpoenas issued to the minor, arguing that the government failed to make the minimum disclosure of the grand jury's purpose required by our decisions in In re Grand Jury Proceedings (Schofield I), 486 F.3d 85 (3d Cir. 1973), and In re Grand Jury Proceedings (Schofield II), 507 F.2d 963, 966 (3d Cir. 1975). These cases establish that a party seeking enforcement of a grand jury proceeding is required to make

a minimum showing by affidavit . . . that each item sought was (1) relevant to an investigation, (2) properly within the grand jury's jurisdiction, and (3) not sought primarily for another purpose.

507 F.2d at 966. While the information supplied in the affidavit may be "scant," it must give "the trial judge some basis for determining that the three-pronged test . . . has[s] been met." Id. at 967.

It would be an overstatement to characterize the information contained in the affidavit submitted here as even "scant" as the affidavit contains nothing at all beyond a mere recitation of the Schofield requirements. Our Schofield decisions, if they mean anything at all, require something, albeit a small something, more.

My concern over erosion of the Schofield requirements is obviated in this case by the further proceedings conducted by the district court to ensure the need for the minor daughter's testimony.  Were it not for these further proceedings, I am convinced that reliance on the affidavit as it was written would have been error.